OPINION OF THE COURT — BY
CHIEF JUSTICE HAMPTON.
This cause was argued before the Supvemeyourt sometime ago, and if my reccollection be correct, all the judges who presided at the hearing, among whom was his honor, the present chancellor, were well satisfied that complainant, unless his participation in the fraud which he charges on defendant precluded it, was entitled to the relief asked of the interposition of this court. Pressed on the one hand by a conviction of the equity of the plaint, and deterred on the other, by the suspicious badges worn by him who made it, the court not willing too rashly to deny its statutary power, in relieveing against successful fraud, or too precipitately to employ it, in. *198 behalf of one who meditated, by the same transaction he complained of, a-fraud against others, that it might be better informed and enlightened on the subject, directed a re-argument. The death of the defendant, with other causes, has delayed the discussion until the present term, when owing to the changes that have occurred on the bench, only two of us could preside.
To one little conversant with the transactions of human life, and not familiar with the exhibition of testimony, before juridicial tribunals, the irreconcilable statement in the hill and answer now before us would appear strange, indeed. But however it is a subject of regret to the moralist, those of us who are called to the frequent investigation of controversies, originating in the commerce of man with his fellow men, and to peruse the history of judicial proceedings as reported for centuries, have often to encounter instances of discrepancy in testimony, so great, that, after the most charitable allowance for honest misconception, imperfection of memory, and involuntary prepossession, the mind perceives sufficient reason, still to believe that there has been on one side or the other, if not on both, a voluntary alteration from conscious truth. But should the present case present any grounds for animadversion in this respect, so far as defendant may he implicated as to all except what duty demands, I desire to stand reproved by a recollection of his fate, and “ to tread lightly on the ashes of the dead.” The brief made •for tho use of the court by complainant’s counsel, containing for all the purposes of this opinion, a sufficient recital of the matters set out in the bill, answer, and depositions.
I will first consider the question to which the attention of counsel was particularly invited by the court, when this cause was ordered for re-argument. Whether by the same transaction which complainant’s counsel for be himself denies it in his answer, charges as big with the fraud of defendant, he does not himself stand convicted of such foul practices, in reference to the rights of others, as should cause his banishment from this sacred forum of equity and good conscience? The bill assigns as a reason for the conduct of complainant in this behalf, the improvidence of his wife, and expressly denies all fraudulent intention; and this allegation is supported, by several of the witnesses sworn for complainant, and by two of those whose depositions were taken by defendant. The charge of fraud rests upon the por-tulatum, that the rites of marriage between plaintiff and his wife, wore cel *199 -ebrated in the state of Louisiana, where the civil law prevails, civil code, page 338, article 83. The answer of the defendant, or any matter adduced for its support, does not satisfy the court of this fact. For though the proceedings had before the parish judge Osborne, at the instance of plaintiff’s wife, who prayed for and obtained an order of divorce a mensa et ihoro might, at its first aspect, favor a belief of this kind, yet, on a more careful consideration, the testimony, to speak most favorably of it, is at best ver} equivocal, and standing alone, cannot produce satisfactory conviction on the mind.
Rather than impute fraud on such doubtful proof, it is safer to conclude, what, in the absence of more convincing proof to the contrary,'! am inclined to think is the fact, that the marriage took place in the state of Georgia, or elsewhere, before the parties migrated to the state of Louisiana. But even if it be conceded, that the marriage occurred in the last named state, I cannot think the proof of fraud is by any means satisfactory to the mind. On a careful comparison of the articles in the civil code, defining the property of the community, superinduced by marriage, page 338. The provisions of the same code, ch. III. page 32; indicating “ the provisional proceedings to which a suit for separation may give occasion,” and “ the effects of a separation from bed and board” exhibited in ch. V. page 34; of the same work, with the judicial proceedings, had before the local competent authorities in this very case, the conclusion forced irresistibly upon the mind, is, that as regards the specific property, now pursued by plaintiff, and which was the premium of the fraud charged on defendant, no injury was worked by the acts of complainant on the real legitimate rights of his wife. Else why was not this property included in the inventory of effects of the community, made out for the benefit of his wife? Or why was not a part of it designated for her interest in the division of the goods of the community, when a separation from bed "and board was decreed 1 It is manifest, from a careful consideration of all the evidence in the cause, that this transfer of his property to defendant, was not complainant’s own device — the well pondered scientific act of deliberate wickedness, but the ready invention of one, able to vindicate the appeal which had been made to his benevolent interposition, by the display of powers commensurate, not only with the security and protection sought by complainant, but also/or the accomplish *200 ment of islterior purposes, which might eventually be advantageous to him self. If we deemed this man, who has stood so long before us, waiting for an aid to effectuate his rights, as one so blackened by the fraud ofhisown practice's, as to dishonor his appeal to the conscience, it would not be sufficient tor his counsel to deny to defendant the right before this court to cry foul! The court itself, in order to preserve the sanctity of its own conscience, and the purity of the annals of its chancery proceedings, woul^ close this temple forever against his guilty approach. But on a long con sideration of the facts and authorities, we do not feel justified in repulsing from our door, not only without relief, but burdened with costs and branded with infamy, one whom we are disposed to consider more as “the victim of anothers artifice,” than the perpetrator of fraud himself, and though we have no disposition wholly to approbate or vindicate the motive, which, so far as his wife was in contemplation, appears to have actuated complainant, we are compelled to consider his acts, if faulty, at worst, only abortive efforts to prejudice the suppositious rights of his wife, and cannot, for this cause alone, deny him relief against the coin and machinations of one who hoped to have fortified himself in the enjoyment of his ill begotten gain, behind these double bulwarks of fraud.
Having- admitted complainant to our bar, it becomes our duty to en-quire in the next place, whether he. has made out such a case, as calls for the interposition of this court to effectuate his redress? Being met at the very threshold of this investigation by the solemnity and ostensible fairness of the contract between the parties, it is indispensable to determine on principle and authority, how far, if at all, it is competent for the court to scrutenize by the light of evidence, aliened and subordinate in grade* its imposing character. We have examined the authorities on this point with great cafe, and though there be a difference of opinion, to be feund in the books, we are satisfied that the weight of authority is in accordance with the opinion of Chancellor Kent, expressed, after the examination of many decisions, in the case of Boyd vs. McLean. 1 Johnson’s Ch. Rep. 582. “That á resulting trust may be established by parol proof in opposition to the deed, and in opposition to the answer denying the trust” — and the opinion of the same able chancellor, expi essed in a like full and careful 'examination of authorities, in the case of Gillespie vs. Mcor, 2 Johnson’s *201 C!i. Rep. 585 — where it is decided, “that equity relieves against a mistake as well as fraud, in a deed or contract in writing, and parol evidence is admissible to prove the mistake, though it is denied in the answer, and this either when the plaintiff seeks relief affirmatively on the ground of the mistake or where defendant sets up as a defence, or'to rebut an equity.” The chancellor says, page 598, “It has been the constant language of the courts of equity, that parties can have relief in a contract founded in mistake, as well as in fraud.” The rule in the courts of law is, that the written instrument does, in contemplation of law contain the true agreement of the parties, and that the writingfurnishes better evidence of the sense of the parties,'than any that can be supplied by parol, and with thiq agrees the decision ofthis court, in the case of John Ker, administrator, vs. Thomas Calvit, which was a case on "the law side of the court, where it was held, that we could not depart from the covenant contained in the deed, which settled the contract^ to loose conversations, long anterior to it. But to return to the chancellor, he says, “Equity has a broader jurisdiction, and will open the written contract, to let in an equity, arising from facts, perfectly distinct from the sense and construction of the instrument itself.” Lord Thu rio w held,-Vesey 113 to 350, “It must be an essential ingredient to any relief under this head, that it should be on an accident perfectly distinct from the sense of the instrument.” . Chancellor Kent adds, “I have looked into most, if not all, of the cases on this branch of equity jurisdiction, and it appears to be established, and on great and essential grounds of justice, that relief can be had against any deed, or contract in writing, founded in mistake or fraud. The mistake may be shown by parol proof, and the relief granted to the injured party, whether he sets up the mistake affirmatively by bill, or as a defence.” Whatever a court of equity would do to relieve against a mistake, so much at least it would do, to relieve against fraud, whicb.has long been the subject of its acknowledged jurisdiction and against the iniquities meditated or inflicted by it, the chancellor is ever anxious to afford an adequate remedy. We do not consider it necessary to multiply authorities on this point, reposing with confidence on the conviction pro-’ duced in our minds, by a careful examination of many of them. That the rule in equity indicated by the cases already cited, is now too well icsfublished tobe lighijy disregarded, and that by it, this court can admit *202 evidence aliunde, though it be parol, by which to scrutinize the character of the conveyance, under which defendant would mask those transactions, between himself and .plaintiff, which are now the subject of investigation before us. Let us now see if in the light reflected from the testimony produced in the cause, this written conveyance, is in fact, whati^ purports to be, an absolute conveyance -to defendant, for valuable consideration, without any reservation or trust of all the plaintiff’s right and title to the .property specified therein? That it is not, is expressly charged in the bill, which allegation is supported by the testimony of four or five witnesses, whileits denial is made by the answer unsupported by any testimony. except the deposition of one witness, a Mr. Pearson, who was called with one Samuel Iiirldand, to witness the conveyance-and delivery of the property, remained with the parties only a short time, and heard no conversation between them respecting the transaction, but supposed it was in good faith. It may be well to state more specifically'the testimony of complainant’s witnesses on this point. -Reuben Moore, speaks of defendant’s own declarations, to the following effect: — “That the. defendant would plague complainant a while, and -then give him his negroes. Thai the bill of sale was only given to keep complainant’s wife from the negroes.— Joseph Dunbar-states, that in a conversation which passed in his presence, between the parties, on the subject of plaintiffs difficulties, defendant told plaintiff, he could put -him in a way to secure his property, and that was to make a sham sale of it to some one, until the law suit was determined, and offered to take the property himself, and said he would do all in his power to befriend complainant, and to prevent his wife from destroying it William Philipps was present at a conversation between the parties, at a Mr. Spiller’s, when defendant told plaintiff “Judge Osborne and Charles Bushnell would get all his property; that he defendant, had always heen a friend to plaintiff, and offered to take his property and befriend him and his children;” to which complainant assented. “Defendant said that there ought to be some money'paid, but he had none, complainant said he had some, and defendant said let me have it, and I will return it.” Heard defendant say he had taken the negroes and other property of plaintiff to befriend him.” Alexander Bookter states, that sometime after he had seen the parties together at Spiller’s, defendant told witness, “that ho had got *203 tile negroes of complainant home in his own possession, and had paid for them, and complainant along with them, and laughed.” William Benis states, that he heard defendant say, he “had taken the negroes and other property of complainant into his hands, to- secure it for him, as it was his intention to befriend him.” After this exhibition of proof, it is impossible for the mind to remain in doubt, of the true nature of this transfer — that it was made, not for valuable consideration, paid or to be.pjid, but without consideration, under the influence of misplaced confidence and credulous simplicity, is abundantly obvious; and the appeal to this -court by the plaintiff for relief, and the exertion made by defendant, to resist that appeal, afford satisfactory evidence, that so far from fulfilling his assurances of good faith to the grantor, the defendant meditated a blow, prostrating at once all the integrity of private faith, and the long jeopardised rights of complainant.
Is there no energy in the whole compass of’chancery power, which can afford to the plaintiff the.protectionhe implores? The evidence satisfactorily proves the statement in the bill, in- regard to the perturbation ot mind plaintiff was subject to at the time .of the transfer; some of the wit nesses considered it so great, as to have amounted to a partial derangement; nor are we to wonder at the effects, when we are told, that the cause was family discord, adequate to the production of results, more awfully melancholy, than the condition of complainant.
It is manifest, from a consideration of all the. facts, that plaintiff acted in this affair, under the influence of an exigency,, of afflictive domestic circumstances, which-, connected with great imbecility of- mind, rendered him an easy dupe to the treachery of proffered friendship. Though there is not that particular relation between .the parties, which presupposes, on the one hand, an ascendancy, which, when impelled by self interest, was capable of exerting, undue influence, and on the other, the habitual exer cise of implicit confidence and passive acquiesence, which, taken in connection with great imbecility of mind, would, as in the case of Lord South-hampton, justify relief against voluntary conveyance's, obtained under such circumstances, yet we consider the great distress of mind plaintiff was in, and the proffered assistance of defendant, as circumstances not unworthy the consideration of the court. Vide Pickett vs. Loggan, 14 *204 Vosoy, 231-. In first Maddox, 21 ], the author says, “If a conveyance by lease and release, or bargain and sale' has been obtained, by means* which, in a court of equity, have the character of imposition, fraud, op" pression, or undue advantage, which indeed may be all comprehended, under the general term fraud, a fine constituting a part of that conveyance, which is so affected, whatever may be the effect at law, is no bar to relief in equity. Tlje,person deriving title under it, is a trustee, and the species', of relief is by directing a re-conveyanceand cites the above case from 14 Vesey, with many others. As to the difficulties said to arise in embarrassment of the court, from the statute 29, Car. II, it is considered, that if nothing be said in regard to its being in force in this country, farther than its provisions have been adopted or re-enacted by our own legislatures, or of its provisions so far as they relate to trusts, being inapplicable to personality, it is sufficient for the present case-to adopt the language found in Roberts’ on frauds, page 102: — “That whenever the declaration of a trust has been presented by fraud and deceit, or whenever the creation of a trust has offered itself as the means of frustrating fraudulent contrivance, and affording substantial justice to the victim of another’s artifice, courts of equity have not suffered the letter of the statute to embarrass the relief, and to protect what it was framed to prevent.” Thym vs. Thym, 1 Vern. 290.
In every point of view, in which we have examined this subject, we feel fully persuaded that it be'comes our duty to consider defendant as holding the contested property, and its increase, in trust for plaintiff, and to decree a re-conveyance thereof, by those who represent him, and if it would be available to complainant, an account of the profits since the delivery of the property under the sale. But in justice to those who have labored for complainant, in maturing his cause for hearing, and who would else be uncompensated, he must take this decree encumbered with bis own costs.
Judge Black concurred.