## WILLIAM MITCHELL *v.* NANCY WELLS.

1. SLAVERY: AFRICAN RACE, STATUS OF, IN UNITED STATES.—At the time of the Declaration of American Independence, and at the date of the adoption of the Constitution of the United States, the African race was regarded by all the States as an inferior and subordinate class, unfit for self-government, or political or social fellowship with the white race, and possessed of no rights except such as the dominant race might choose to grant them; and they are not embraced in the general terms of either the Declaration or the Constitution.

2. SAME: AFRICANS NOT CITIZENS OF UNITED STATES.—Citizenship in the United States, in the sense of the Federal Constitution, can be conferred on, or acquired by, the white race only; and hence, though each State of the confederacy, in virtue of its sovereignty, may, within its own limits, confer citizenship on the African race, yet such persons so admitted to citizenship by one of the States, are not thereby vested with the rights of citizens of the United States.

3. SAME: POWER OF ONE STATE TO CONFER CITIZENSHIP ON AFRICANS.—The same rights of sovereignty which enables one of the States of the confederacy to confer citizenship on persons of the African race, within its own limits, authorizes the co-States to regulate and determine, in their discretion, what effect such admission to citizenship shall have within their respective limits.

4. PUBLIC LAW: POLICY OF A STATE: HOW ASCERTAINED.—The constitution and laws of a State are the most usual, direct, and positive, but not the sole evidence of its policy. Courts, in determining the policy of a State, may consider not only her constitution and laws, but her whole condition, circumstances, and history. Handy, J., dissented.

5. SAME: SLAVERY: POLICY OF MISSISSIPPI IN RELATION TO.—It is the policy of this State to preserve and perpetuate the institution of African slavery, as it exists in the United States, and, to this end, to prevent the emancipation, here or elsewhere, of slaves once domiciled in this State. Handy, J., dissented.

6. INTERNATIONAL LAW: COMITY OF NATIONS.—The comity of nations is simply the obligation which sound morality, enlightened justice, and natural reason suggest as promotive of mutual happiness and goodwill in the intercourse of nations with each other, and is, from its nature, incapable of ever being defined and fixed by any certain and inflexible rules.

7. SAME: SAME.—The laws of a State have not, *ex proprio vigore*, any extra-territorial operation; and their force and effect, in another State, depend entirely upon the comity of nations, of which each State, when an act done, or a right acquired under the laws of a foreign State, is sought to be enforced within its limits, is the exclusive judge.

8. SAME: SAME: CONTRACTS AGAINST POLICY OF A STATE NOT ENFORCED.—No State is bound, by the comity of nations, to enforce, or hold valid, in its courts

of justice, any contract made, or act done in another State, which is injurious to its rights, or violates its laws, or contravenes its policy, or offends the morals of its people.

9. SAME: SAME: STATUS OF A SLAVE IN THIS STATE: HOW AFFECTED BY FOREIGN MANUMISSION.—The *status* of a slave in this State is fixed by its laws, and it cannot be changed elsewhere so as to confer rights or privileges on such slave in this State, inconsistent with its laws and policy.

10. SAME: RIGHTS OF MISSISSIPPI SLAVE MANUMITTED IN FOREIGN STATE.—The policy of Mississippi being against the emancipation, either here or elsewhere, of slaves once domiciled within her limits, her courts will not give any effect to the emancipation of a Mississippi slave in another State ; and a slave so manumitted cannot, therefore, take or hold any property in this State, or maintain any suit in her courts.   Handy, J., dissented.

11. SAME: EFFECT OF CHANGE OF POLICY OF STATE PENDING A SUIT ON ITS CONTINUANCE.—A person seeking to enforce, in the courts of one State, a right acquired under the laws of another, is a mere suppliant for the bounty of the former.   He has no vested interest to demand the enforcement of the rights so acquired under the laws of a foreign State; and hence, if, pending a suit by him to enforce such right, it becomes against the laws and policy of the State in which he has brought the suit, to enforce it, his suit can no longer be maintained.

12. SAME: SAME: CASE IN JUDGMENT.—If there could be any doubt that the policy of Mississippi was against the emancipation, either here or elsewhere, of slaves once domiciled here, prior to the Act of 1857, Rev. Code, p. 236, Art. IX, it is clear that such policy was then plainly declared ; and therefore, if it be conceded that a slave once domiciled here, might theretofore be carried to another State and there manumitted, so as to acquire the right to hold property here, a suit pending to enforce such a right at the passage of the act would be dismissed.

APPEAL from the Chancery Court of Madison county : Hon. E. G. Henry, chancellor.

*R. A. Clark,* for appellant.

*John D. Freeman,* for appellee.

HARRIS, J., delivered the opinion of the court.

The appellee filed her bill in the Chancery Court of Madison county, on the 21st August, 1857, as a citizen and resident of the State of Ohio, against the appellant, formerly executor of the will of Edward Wells, deceased.

Appellee alleges that she is a free woman of color, and daughter

of testator, who died in Madison county, Mississippi, in October, 1848. That by his will, testator bequeathed to complainant a watch, bed, and three thousand dollars, to be raised out of his estate. That appellant qualified as executor, in 1848, the other executor named in the will renouncing; that the heirs of testator, except complainant, by written agreement among themselves, valued and divided the estate, which was reported to, and confirmed by the court, in November, 1846, and the defendant discharged as executor. That defendant was credited in the settlement thus made with $5550; and with this sum and certain lands specified he agreed to pay complainant's legacy. That Wells's estate was worth $23,808, and her legacy was a lien on the estate. That complainant was a minor at the date of the will, and the executors were directed to invest the legacy for her. That the defendant retains the legacy on the pretext that complainant is a slave. That in 1846 her father took her to Ohio, and domiciliated her there, and ever afterwards recognized and treated her as a free woman; that her freedom was established by law in Ohio. (Exhibits A. and B.)

The bill admits that Samuel Watts, her reputed husband, was a slave, and that she lived with him, but denies that she was legally married to him.

The prayer of the bill is for account and for general relief.

To this bill a demurrer was filed and overruled. The appellant answered, denying the freedom of complainant, the existence of the deed of emancipation, and notice of the proceedings in Ohio, and charging that the same are void. The answer then charges that the testator took complainant to Ohio in fraud of the laws of Mississippi, and with the intention to return to this State; that complainant remained in Ohio only about eighteen months, and did so return and reside in Mississippi at the place of her former residence, with her former owner, and as a servant in his family, until September, 1848, when she married Watts, a barber, then residing in Jackson, Mississippi, and went to reside with him there.

That Watts was and is a free man, residing in Mississippi; that complainant lived with him until about June, 1851, when she went to Cincinnati; that the decrees, and attempted emancipation in Ohio, are in fraud of the laws and policy of the State of Mississippi, and void. The answer admits that appellant refused to pay said legacy,

Mitchell *v.* Wells.

and said Watts and complainant, about the 15th October, 1851, filed a petition in the Probate Court of Madison county, to recover the same; that defendant answered said petition, denying complainant's right, and charging that she was a slave, &c. &c.

Proof was taken under the issues joined, and the cause, on final hearing, was determined in favor of complainant. From which decree this appeal is prosecuted.

Upon the important question, raised by the demurrer, as to the right of complainant to maintain her suit in the courts of Mississippi, upon the facts stated in her bill, I am aware that there are cases which seem to imply the existence of this right. Nor am I insensible of the great delicacy and importance of the questions here presented. In ordinary cases involving individual rights, I might feel permitted to yield to these precedents at least tacit acquiescence, however opposed to my own convictions of right. But in great questions of public policy, interesting alike to our own, as to the citizens of other slaveholding States, involving the security of our institutions and the safety of the people, I do not feel that I am at liberty, in deference to the opinions of others, to yield my convictions of duty and official responsibility, upon motives of delicacy, however oppressive, or upon principles of ordinary judicial expediency, however well established in matters of private right.

I feel the more constrained to this course from the fact, that while the policy of the State seems to me, especially since 1842, to have been declared and avowed with greatly increased stringency, the judicial department has adhered to the case of *Ross* v. *Vertner*, in 5 Howard, which was virtually disapproved, as an exposition of the policy of this State, at the next succeeding legislature. Indeed a careful review of the adjudications of this court on this subject would seem to be demanded by the obvious policy of the State on the subject of emancipation, as declared by her latest legislation, as well as by her settled conviction, that the interests of both races are best promoted by the institution of slavery as it exists amongst us, and most seriously prejudiced by either manumission in the Union, or colonization elsewhere. See Resolutions, January, 1857.

I think it demonstrable, both upon principle and the weight of authority, that a slave, once domiciliated as such, in this State,

can acquire no right, civil or political, within her limits, by manumission elsewhere. That manumission and citizenship, *elsewhere conferred*, cannot, even upon principles of comity, under our laws and policy, vest any right *here*.

Before proceeding, however, to discuss these questions, we will give a synopsis of the state of judicial decision on this subject in this court.

The first case to be found in our reports on this subject is the case of *Hinds* v. *Brazealle*, 2 How. 837. Judge Sharkey delivered the opinion of the court. The principles asserted in this case are,

1st. That no State is bound to recognize or enforce a contract made elsewhere, which would injure the State or its citizens, or which would exhibit to its citizens an example pernicious and detestable.

2d. It is a settled and sound principle, that no State will enforce a contract made elsewhere, by its citizens, in violation of its laws.

3d. A deed of emancipation, executed *elsewhere*, by a citizen of Mississippi, in fraud of her laws, *is void here*. Its validity depends upon the laws of this State.

4th. No owner can emancipate his slave but by deed or will, properly attested, or acknowledged in court, and by proof to the legislature that such slave has performed some meritorious service for the benefit of the owner, or some distinguished service for the State; and the deed or will can have no validity until ratified by a special act of the legislature. (This was so held under the Act of 1822.)

5th. A slave cannot take property by devise, and it is equally clear that it cannot be held in trust for him.

6th. That to give validity to a deed of emancipation executed in another State, by a citizen of Mississippi, in favor of a slave domiciliated here, would be, in the first place, " *a violation of the declared policy*, and contrary to a positive law of the State, passed by the legislature expressly to maintain this settled policy, and to prevent emancipation." . . . . " It is believed," says Judge Sharkey, " that this law and policy are too *essentially important* to the interests of our citizens to permit them to be evaded."

7th. Independent of the principles of law laid down in adjudicated cases, our statute law prohibits slaves from owning certain kinds of property; and it may be inferred that the legislature sup-

Mitchell *v.* Wells.

posed that they were extending the act as far as it could be necessary to exclude them from owning any property, as the prohibition includes that kind of property which they would be most likely to own without interruption, to wit, hogs, horses, cattle, &c.    They cannot be prohibited from holding such property in consequence of its being of a dangerous or offensive character, but because it was deemed " impolitic for them to hold property of any description." ˙ ˙ ˙

*Vick's Exrs.* v. *McDaniel,* 3 How. 337 was the next case.    The testator, by his will, directed his slaves to be emancipated, and transported to Indiana or Ohio ; and this will was declared void, because in violation of the fundamental law and settled policy of the State.

In *Ross* v. *Vertner,* 5 How. 305, it is held, 1st, " that when the testator, by his will, directed his slaves to be sent by his executors to Liberia, there to remain free, it was a valid trust."

2d. As it is not against the policy of the State for the owner of slaves to send them out of the State for manumission, he may direct it to be done by will.

3d. That the policy of our statute is opposed to the augmentation of free negroes in the State, by emancipation.

4th. It is not the policy of Mississippi to augment her slave population.

In *Luckey* v. *Dykes et al.,* 2 S. & M. 60, it is held, " that a bequest in a will, directing the executors to emancipate the slaves of the testator, is void, because in opposition to our State policy."

The slaves were set free by the will of the decedent, in this State, but the will further directed, " As I particularly charge my executors to have my slaves attended to, have their freedom, and settled on the land left to them, except they should wish to go to some other State ; in that case, sell their land, and see them removed and settled."

The case of *Cooley* v. *Leech,* 6 S. & M. 93, decided at January term, 1846, was this : Leech died in 1836, in this State, and by his will directed his slaves to be set free, and sent to Indiana or Liberia, as they might prefer.    He directed, also, the sale of his property, and part of the proceeds to be paid to the slaves thus liberated.

Judge Clayton, delivering the opinion of the court, likens it to *Ross* v. *Vertner,* 5 How.    In that case, the will directed the slaves to be sent to Liberia, there to remain free.    " This will directs the

slaves to be set free, and then to be sent off: the order of the words being inverted." He says, " the mere collocation of words, if their meaning be the same, cannot vary their construction. . . It is the policy of this State, as evinced by its legislation, to *prevent the increase of free persons of color therein.*" " If the executor in good faith, and with strictness, comply with the terms of the will, we see nothing in the law to prevent its execution; the right to freedom, under the will, is inchoate, and becomes complete when the subjects of it are removed to another State or country, according to its provisions. The bequest to the slaves is not void either, for want of capacity in the legatee to take. If they do not comply with the terms of the will, the whole bequest is void; if they do, it will be valid."

This being the first case decided after the passage of the Act of 1842, it deserves attentive consideration.

It will be observed that this act was passed shortly after the decision in *Ross* v. *Vertner*, and was, doubtless, designed to have it no longer a matter of judicial speculation, as to what was the policy of this State in relation to the emancipation of slaves.

The act provides: " Hereafter, it shall not be lawful for any person, by last will or testament, to make any devise or bequest of any slave or slaves, for the purpose of emancipation; or to direct that any slave, or slaves, shall be removed from this State for the purpose of emancipation elsewhere: and in all cases of wills heretofore made and admitted to probate within this State, whereby any slaves have been directed to be removed from this State, for the purpose of emancipation elsewhere, or whereby any slave, or slaves, have been devised or bequeathed in secret trust, for such purpose, unless such slaves shall be removed from this State within one year after the passage of this act, it shall not be lawful for the executor or executors of such last will or testament, or the person or persons having possession of such slave or slaves, under the provisions of such will, so to remove such slave or slaves, but the same shall descend to, and be distributed among, the heirs at law of the testator, or be otherwise disposed of according to law, in the same manner as if such testator had died intestate. Provided, however, that if such executor, or other person having such possession, shall be prevented or restrained, within the said time of one year from such removal,

by injunction, or other legal process, or otherwise, the time during which such restraint shall continue or exist, shall not be taken or computed as any part of said time of one year;" and with a further proviso, that emancipation may be effected by legislative sanction.

This case of *Leach* v. *Cooley* was not decided until after the abrogation of the new clause in the Constitution, which prohibited the introduction of slaves as merchandise, and after the virtual repeal of the Act of 1837. It appears from the statement of the case, that the will under consideration was executed on the 4th of March, 1836, on the same day that testator died ; that the slaves were not removed from this State when the petition to have them inventoried as the property of the estate, and for final account and distribution, was filed by the appellant, in 1845. And yet the Act of 1842 is neither cited nor referred to by either the counsel or the court. If not conclusive on the case in favor of appellants (which to my mind is clear), it was at least indicative of public policy, and was worthy of mention by the court when citing, *with approbation*, the case of *Ross* v. *Vertner*, the effect of which it was intended to avert. And more especially was it worthy of remembrance when the court was sanctioning the doctrine asserted in *Ross* v. *Vertner*, "that it is the policy of this State, as evinced by its legislation, to prevent the *increase of free persons of color* therein," instead of the doctrine asserted in *Hinds* v. *Brazealle*, "that our policy is *to prevent emancipation.*" Of which policy, at the date of this decision, there should not have been, in my judgment, the shadow of a doubt.

This opinion was further objectionable as an exposition of public policy at that date, not only in view of the Act of 1842, which it wholly pretermitted, but in view of the history of the provision inserted in the revised Constitution of 1832, and the subsequent legislative action in relation to that provision by which it had then been abrogated.

In *Ross* v. *Vertner*, in addition to limiting the policy of this State to the "*prevention of the increase of free negroes therein,*" it was further asserted that, "*It is not the policy of Mississippi to augment her slave population.*" And the new clause in her revised Constitution, and the Act of 1837, are there alluded to as indicating this view.

But in 1846 a different state of things existed. I am not prepared to admit, in view of the practice and known sentiments of the people of Mississippi, and more especially in view of the reason for the action of the convention which introduced the clause referred to, that the case of *Ross* v. *Vertner, rightly considered* this change of our Constitution, and the Act of 1837, as an evidence of a change of the policy of Mississippi on the subject of emancipation.

I should also differ with the court in the construction of the language of this will, by the *rule of inversion* applied to it, were that a question before me; and while I agree with the court, as well as counsel for the appellee, in that case, that "bad grammar" does not vitiate a will, yet it seems to me that, in their zeal to give efficacy to the intent of the testator, they failed to remember that *bad faith to the policy of the State will so vitiate,* any act, contract, or conveyance into which it enters. With all respect, therefore, to the distinguished functionaries who presided in this court when this decision was made, I cannot regard it as authoritative on the questions upon which I am now called to deliver my judgment.

In *Thornton* v. *Demoss,* 5 S. & M. 609, Ch. J. Sharkey, delivering the opinion of the court, says : " In all civil proceedings, negroes are regarded by our laws as *property*." . . . . "Negroes, although *persons,* for some purposes, are generally regarded as property, and excepted out of the general legislation in regard to persons, unless specially included. The color of a negro is *prima facie* evidence of liability to servitude." See, also, 1 Speers S. C. R. 268 ; 1 Richardson, S. C. R. 318–324 ; 1 Miss. R. 197 ; 8 Georgia R. 157 ; 2 Bibb, 238 ; 2 Halst. 253 ; 3 Halst. 375 ; Martin & Yerger, 427 ; 5 Cowen, 480 ; 1 Martin, 183 ; 2 Hayw. 170 ; 3 Dana, 382 ; 6 Gill & John. 136 ; 1 Dev. 376 ; 4 Harr. & McHenry, 295.

A negro, by the laws of this State, is *prima facie* a slave. *Coon* v. *The State,* 13 S. & M. 249 ; 23 Miss. R. 572 ; *Randall* v. *The State,* 4 S. & M. 351.

The next case in order is the case of *Wade* v. *The American Colonization Society,* 7 S. & M. 663. This case determines that a slave has capacity, in this State, to take property by devise, and that property may be held in trust for a slave in this State, in opposition to the doctrine asserted by Judge Sharkey, in delivering the opinion of the court, in *Hinds* v. *Brazealle.* It further deter-

mines that the American Colonization Society, a foreign corporation, whose object by its charter, as alleged in the bill, "is in accordance with the provisions of the will of Ross, and in furtherance thereof—a purpose at war with the existence of slavery—may act as trustee *here*, and may invoke the aid of a court of equity *in Mississippi*, to remove slaves domiciliated here, out of our limits, that they may be there emancipated, so as to enable the Colonization Society to effect their liberation.  That it is the duty of the Colonization Society to carry out that purpose, and that it is the duty of a court of equity *in Mississippi* to enforce the performance of these trusts by both."

The decision in this case, in my judgment, constitutes the crowning error of these misconceptions of our public policy, originating in the case of *Ross* v. *Vertner*, extended in *Leach* v. *Cooley*, and finally overturning our laws and policy, against the emancipation of slaves domiciled in this State, *at the suit of the avowed public enemy of both*.

It was to have been expected, therefore, from the eminent and patriotic jurists who then adorned the bench, that a return to the better and safer doctrines announced in *Hinds* v. *Brazealle*, would vindicate our State policy and laws from the error into which these decisions had betrayed them.

Accordingly, in the case of *Mahorner* v. *Hooe et al.*, 9 S. & M. 247 (a case commanding the most earnest attention, both from the amount involved and the importance of its principles), Judge Sharkey, delivering the opinion of the court, and in view of all these decisions, avows and sustains *the policy* indicated by the Act of 1842 *against emancipation;* declares that act to be constitutional; that it is not repugnant to the constitutional provision referred to in *Wade* v. *The Colonization Society;* that it was competent for the legislature to discountenance emancipation by defeating the declared intention of the testator, although that intention was to be consummated beyond the limits of the State of Mississippi; and that the court may look to the ultimate destination of the property abroad, and if that destination be incompatible with the best interests of the State, the intention of the testator may be defeated, if he has made it known.  He says, " We think the law of 1842 is a valid prohibition, paramount to that rule of comity which, in the

absence of such prohibition, might sustain the bequest on the law of the testator's domicile."

In another place he says : " We hold that the interdiction may result from general laws, declaring public policy, as well as from special laws framed for that purpose; and whilst we freely concede that in this confederacy of States, comity is indispensable, and should be extended in the most ample manner, yet it cannot be allowed to defeat the general policy of a State, declared by legislative authority." He regards this rule of comity as expressly abolished by the Act of 1842, so far as it permits the emancipation of slaves in this State, by persons residing in other jurisdictions, though they are to be removed beyond our limits for that purpose ; and in these principles, announced by the chief justice, the whole court agreed.

In *Lusk* v. *Lewis*, October term, 1856, 32 Miss. 297, it is decided that neither by its charter, nor under our laws and policy, can the American Colonization Society take or hold slaves here. The case of *Wade* v. *The American Colonization Society*, may, therefore, be considered as expressly overruled.   See also 23 Georgia R. 448.

In *Weathersby* v. *Weathersby*, 13 S. & M. 685, a will, giving slaves to testator's son, in trust and upon condition that he should furnish them a house, land for their use, farming utensils, &c., sell their crops for them, &c. &c., was held to evince an intention to secure their freedom, in violation of the Act of 1842, and therefore void as to such trusts and conditions, and to vest the title absolutely in the son.

The case of *Leiper* v. *Hoffman et al.*, 26 Miss. R. 615, decided at the December term, 1853, was this : the complainant, a free woman of color, who had removed to Cincinnati, Ohio, in 1845, where she has resided ever since, filed her bill in this State, to recover a house and lot, claimed by her, for which she had paid her money, and the title to which had been executed to her jointly with a free white person.   It is here held, 1st. That such white person is a trustee for the free negro ; that if the deed was inoperative to convey any legal or equitable estate to her *in presenti*, it was still effectual as a conveyance of the legal estate to the white person, and it was competent for him to hold the legal title in trust for her.

Her right of present enjoyment might be prevented by her condition of slavery, but if the trust continued until that disability was removed by admission to the rights of a free person, her rights as a *cestui que trust* would then immediately vest, and she would be entitled to enforce them against the trustee. 2d. That our laws do not prohibit the removal of slaves from this to another State, to be manumitted there, provided it is not done with the intention of their returning here, to act as free persons; and for this the case of *Ross* v. *Vertner*, 5 How., is referred to as authority.

The next case to be found in our reports, relating to this subject, is the case of *Read* v. *Manning*, 30 Miss. R. 308. This case determines, 1st. That the Act of 1842 was intended to apply to *all emancipations of slaves by will*, whether made before or after the passage of the act. 2d. "That it was, *undoubtedly, the object of the legislature to prevent the emancipation of slaves*, and to make provision, in all cases of attempted emancipation by will, for the condition of slaves as to the parties interested in them after such attempted emancipation. There could be no reason why the legislature, in *instituting a policy prohibitory of the emancipation of slaves*, should not have made the same provisions with regard to such as should be emancipated by wills made *after* the passage of the act, as to slaves embraced in wills already made and probated. . . . . And the only difference between the two classes of emancipation, would appear to be, that, as to the former, the act took effect immediately, whereas, as to slaves previously emancipated, provision was made for their removal from the State within a limited time."

In *Lusk* v. *Lewis*, 32 Miss. R. 297, it is held, that a bequest of slaves in trust for the American Colonization Society, without any intention appearing to create a personal benefit in favor of the trustee, conveys no title, and is void under the Act of 1842. That, by their charter, the American Colonization Society have no power to take and hold slaves as they are held and recognized by our laws; but that they can only receive them for emancipation and colonization. "It cannot be doubted," says the court, "that the policy on which the Society was established, contemplated not only the removal of such free persons of color as were in the United States at the time of its incorporation, but also of such slaves as might in

Mitchell *v.* Wells.

future be emancipated. This policy afforded an opportunity to such persons as owned slaves, and desired to emancipate them, to do so without being subject to the evils of an increase of the free colored population in the country; and hence the establishment of the Society had a tendency *to encourage emancipation,* if, indeed, that was not an object within the special contemplation of the institution. *Its operation was calculated strongly to promote emancipation, and it may therefore be regarded as founded on a principle not consistent with the growth and permanency of the institution of slavery. For it cannot be supposed that an effect so obvious, was not intended as a part of the system.*" . . . That both in England and this country, a bequest in trust for an illegal purpose, is void. Citing *Micleton* v. *Brown,* 6 Ves. 52–66; *Morrice* v. *Bishop of Durham,* 10 Ib. 521–35; *Boron* v. *Statham,* 1 Edwards, 508, 516; *Bynum* v. *Bostick,* 4 Desaussure, 266; *Stevens* v. *Ely,* 1 Dev. Eq. R. 493; *White* v. *White,* 1 Dev. & Bat. Law R. 260; *Huckaby* v. *Jones,* 2 Hawkes, 120.

The last case reported in this court is that of *Shaw* v. *Brown,* 35 Miss. R. 246. Brown, the appellee, filed a bill as the next of kin of the decedent, to enjoin the execution of certain trusts in the will of said decedent, which were alleged to be illegal and void.

The bill alleges that the testator was domiciled in this State more than twenty years before his death; that he died in January, 1856, leaving a plantation and slaves in this State; that the will was probated, and appellant, one of the executors, qualified as such, and was about to proceed to the execution of the trusts of the will, which complainant alleged to be illegal and void. That the will directed the executor to sell the land and slaves; and after paying the debts, to deposit the residue in the Bank of Louisiana, subject to the draft of Francis M. Brown, and in case of his death, to the order of Jerome M. Brown.

The bill alleges that these beneficiaries, Francis and Jerome, are slaves of the estate; and that the bequest is void, and in fraud of the laws, and against the policy of this State. That in 1849 the testator, with intent to evade the laws of the State, carried Francis and Jerome to Ohio; and there, with intent to return with them to reside in this State, executed a deed of emancipation in their favor, and did return with them to reside in this State.

The answer admits many of the allegations of the bill, but denies the fraudulent intent to return and reside (so far as Francis and Jerome are concerned) in this State ; but, on the contrary, states that they have been emancipated and permanently located in Ohio, or Indiana, since the 11th May, 1850 ; denies that they are slaves, or that it was intended they should return to reside in Mississippi.

On the hearing below, the bequest was declared illegal and void, and a decree accordingly.   This decree was reversed in this court and bill dismissed.   The chief justice gave no opinion, either in this case or in the previous case of *Leiper* v. *Hoffman.*

It was held here, 1st. That when slaves are taken out of this State to a free State, with the intent to emancipate them, and bring them back into this State, if they *are not so brought back, such emancipation* is not against the policy of our laws, and is not void *in the State of Mississippi.*   Both of these acts (emancipation and return to this State to reside here) must subsist, in order to constitute an exception to the rule, that a voluntary emancipation of slaves made in a State where it is allowed by law, is valid, and confers freedom everywhere.   And for this, *Hinds* v. *Brazealle, Vertner* v. *Ross,* and *Leiper* v. *Hoffman* are cited.

2d. That the testator, Brown, unquestionably had the right to take the slaves to another State, where their emancipation was allowed, and set them free there.   That right is not restrained by our laws or policy, but it is distinctly recognized by the Act of 1842. Hutch. Code, 537.   And it necessarily resulted from his absolute right of disposition of them as his property.

3d. The policy of our law is prohibitory of emancipation, *only to this extent,* " first, of freeing slaves in this State to become free *here* or *in another* State.   And second, of emancipating them in another State to become residents of this State as free persons."

4th. That the bill does not put in issue the validity of their emancipation.

5th. That slaves domiciled in this State, may be removed to another State, be there emancipated, and acquire a new domicile ; and with their rights acquire the further right to property bequeathed to them by will in this State.   That their personal capacity to take by will, property in this State, is fixed by the law of their new domicile, and such rights will be enforced by the courts

of this State upon the principles of comity. That the rules of comity are of even stronger obligation among the States of the Union, than upon nations not thus associated.

6th. "That it is not against the policy of this State that free negroes of other States should exercise, in this State, all rights secured to them by the laws of other States where they are domiciled, so far as those rights are not positively prohibited, or are not directly dangerous to the condition of our slaves, by exposing them to improper interference, or to the mischievous example arising from the presence or influence of the free negro ; and that beyond this he may enjoy the rights secured to him by the laws of the place of his domicile."

Any other rule than this appears to be unwarranted by the provisions of our laws, and not in accordance with the principles of natural justice or of settled international law.

In opposition to the views expressed in some of the foregoing cases, I hold, 1st. That comity is subordinate to sovereignty, and cannot, therefore, contravene our public policy, or the rights, interests, or safety of our State or people.

2d. That the emancipation, either here or elsewhere, of slaves domiciled in this State, is against our policy, institutions, and laws.

3d. That all laws of other States, and all acts of their citizens or ours, in opposition to our public policy, are void *within the limits of Mississippi*, whatever validity they may be allowed elsewhere.

4th. That the *status* of a slave, in Mississippi, is fixed by our laws, and cannot be changed elsewhere, so as to give him a *new status in this State*, without our consent.

5th. That a slave can neither acquire freedom, nor a new domicile, nor any other right or capacity in another State, to be enjoyed in Mississippi, in violation of our policy.

6th. That neither the right to sue, nor the right to acquire or hold property in this State, nor the right to any privileges belonging to free white citizens, or inhabitants of other States or nations, accorded by comity, can be conferred upon the African race, in the State of Mississippi, by the authority of another State or nation.

It will be perceived from an examination of the foregoing cases, that, while in *Hinds* v. *Brazealle*, *Vick's Exor.* v. *McDaniel, Luckey* v. *Dykes, Mahorner* v. *Hooe, Weathersby* v. *Weathersby, Read* v.

*Manning*, and *Lusk* v. *Lewis*, either directly or tacitly, it seems to be admitted that our policy is against emancipation, that in the remaining cases it is either asserted, or inferrible from necessary construction, that our State policy is only opposed *to the increase of free negroes in this State*, and does not extend to their removal out of the State, for emancipation elsewhere.

Another broad diversity in these decisions is, that while it is held in *Hinds* v. *Brazealle*, that a slave cannot take property by devise, nor can it be held in trust for him, and this upon general principles, as well as upon a fair construction of our statute law; yet in other and subsequent cases, directly the reverse is held.

Reconciliation would seem impossible; they are directly in conflict, and upon questions of vital importance.

If it be conceded that there is nothing in the public policy of Mississippi opposed to the abolition of slavery, but that her policy only extends to the prevention of abolition *in her limits*, and is not opposed to their removal elsewhere to be set free; and further, that slaves, free negroes, or persons of color, may take and hold property in this State, either directly or through the intervention of a trustee: then their laws of comity entitle them, in the State of Mississippi, to all the rights belonging to them as citizens of the State so recognizing them, not inconsistent with our general policy.

If, on the contrary, our policy is opposed to the whole doctrine of negro emancipation, as at war with the interests and happiness of both races, then, whatever tends to encourage emancipation, or to thwart the cherished policy of our State and people, or to establish the opposite policy, must be void, and should be so declared within the limits of Mississippi.

If Mississippi, by her public policy, has declared herself opposed to negro freedom, or to the emancipation of her slave population, and in favor of the continuance and perpetuation of slavery, then respect for that policy, as well as the great interests it was designed to promote, forbid that she should allow other States, opposed to her institutions, to interfere with that policy, and confer upon that inferior race, *within her limits*, rights and capacities, which, by our laws, they never enjoyed here, and in their nature wholly inconsistent with slavery.

To determine, then, what is the public policy of Mississippi, is

Mitchell *v.* Wells.

the important point in issue. How is this to be ascertained? To what sources must we look for the public policy of a state or nation? Is it the subject of legislative declaration *alone?* To be prescribed by law, as a rule of action, and to be gathered *alone* from positive enactment? Or are we to be guided by the nature and character of our institutions; our Constitution and form of government; their nature, character, and whole history; the manners, customs, and habits of our people; our climate, soil, and productions; the resolutions and public acts of her conventions and general assemblies, as sources of evidence indicating public policy?

Without stopping to discuss this question, we take it as settled, that by the public policy of a State is meant whatever gives distinctive character to its system of government, including its laws and usages, its rights and interests, moral, political, and social.

To render a law, act, or contract, in another State, void as against our policy, therefore, some detriment to the rights, interests, liberties, or morals of the people, or to the laws of the State or its institutions, must be shown, when such law, act, or contract is sought to be enforced here.

Chancellor Kent says, " No people are bound to enforce or hold valid, *in their courts of justice,* any contract which is injurious to their public rights, or offends their morals, or contravenes their policy, *or violates a public law."* 2 Kent, 602, 9th edition.

Judge Story says: " No nation is under any obligation to give effect to the laws of any other nation, which are prejudicial to itself or to its own citizens; that, in all cases, every nation must judge for itself what foreign laws are so prejudicial or not." Story on the Conflict of Laws, sect. 98.

And again: " No nation will suffer the laws of another to interfere with her own, to the injury of her citizens; that whether they do or not, must depend on the condition of the country in which the foreign law is sought to be enforced, the particular nature of her legislation, her policy, and the character of her institutions. That in the conflict of laws, it must often be a matter of doubt which should prevail; and that whenever a doubt does exist, *the court* which decides will prefer the laws of its own country to that of the stranger." Story on Conflict of Laws, s. 28, 141, 147 ; Cobb's Law of Slavery, 127.

"The exercise of comity, in admitting or restraining the application of the *lex loci, must unavoidably rest in sound judicial discretion*, dictated by the circumstances of the case." *Blanchard* v. *Russell*, 13 Mass. R. 6 ; *Commonwealth* v. *Aves*, 18 Pick. 193, 225 ; 2 Kent, 9th edition, 602, and note (*e*); and see Cobb's Law of Slavery, 135–6, sec. 153; Story on the Conflict of Laws, sec. 24.

Looking, then, to our public history as indicative of our policy on the subject of African slavery, we find this race in this inferior, subordinate, subjugated condition, at the time of the adoption of our Federal Constitution.    They were so regarded then by all the States united, and because thus incapable of freedom or of self-government, and unfit by their nature and constitution to become citizens and equal associates with the white race in this family of States, they were rejected, and treated and acknowledged in the Constitution as slaves.

Mississippi came into the Union under this Federal Constitution as a member of this political family, to be associated on terms of political equality, comity, or courtesy with the *white race,* who *alone* by that compact had a right to be thus associated.  She came into the Union, not only recognizing the institution of slavery as her best policy, but forbidding the legislature from passing laws for the emancipation of slaves except by the consent of the owner. She came into the Union *with this institution,* not only sanctioned, provided for, and protected by her own Constitution, by the direct act and recognition of the other States of the Union, and by the express provisions of that same Constitution which had originally excluded the African race from the privileges of citizenship, but with a *right* to full protection, under that instrument, both for the enjoyment of her property in slaves, and against the degradation of political companionship, association, and equality with them in the future.    Her climate, soil, and productions, and the pursuits of her people, their habits, manners, and opinions, all combine not only to sanction the wisdom, humanity, and policy of the system thus established by her organic law and fostered by her early legislation, but they *require slave labor*.

It was declared in the convention that framed the Federal Constitution, by some of their delegates, that Georgia and South Caro-

lina would become barren wastes without slave labor, and so important did they deem it to their prosperity, that they openly announced that these States would not become parties to the Union if the slave trade should be prohibited.

Notwithstanding our first Constitution authorized the legislature to pass laws to permit the owners of slaves to emancipate them, under certain restrictions, no such general act was ever passed; but, on the contrary, as early as 1822, *emancipation*, except for some distinguished service, and even then proven to and sanctioned by the legislature, was prohibited.

From that time until the adoption of the revised Constitution of 1832, various acts and resolutions of the legislature were passed, indicating increased confidence in her policy, and a strong determination to continue and perpetuate her system of slave labor against the efforts of both felons and fanatics, to the contrary.

Nor is it believed that the revised Constitution of 1832, when considered with reference to the history of that time and the evils it was intended to remedy, can be regarded (as indicated in *Ross* v. *Vertner*) as evidence that our policy is limited *to the prevention of the increase of free negroes in this State*, and is not opposed to emancipation generally; or that either the Constitution of 1832 or the Act of 1837, as intimated in that opinion, were ever designed to indicate that it is not the policy of Mississippi to augment her slave population.

It will be remembered, as a part of the history of the State, that about the period of the adoption of our new Constitution (in October, 1832), various causes combined to precipitate upon the Southern States, Georgia, Alabama, and Mississippi especially, a most unusual number of slaves from the border States. The idea became prevalent that the abolition feeling, which had just before then revolutionized the Old World, and had inaugurated its mischievous and mad career in the Northern States of this Union, was inducing Virginia, Maryland, and other States, to dispose of their negroes, with a view to follow the example of some of their neighbors. As a matter of State policy, looking to the protection and perpetuation of slavery, the State of Mississippi intended, by the prohibition against the introduction of slaves as merchandise, or for sale, after the 1st day of May, 1833, to compel these border States to

stand firm by the institution of slavery, by cutting off their market. She intended to prevent *abolition* from effecting the condensation of slavery in the extreme South, as was the evident tendency of things at the time of the adoption of the measure since relied on in her history, as indicative of an abandonment of her long-cherished policy. It was feared that if these border States were permitted to sell us their slaves, and thus localize the institution, *they too* would unite in the. wild fanaticism of the day, and render the institution of slavery, thus reduced to a few Southern States, an easy prey to its wicked spirit. ‑ ‑ •

In addition to this, high tariffs, and other measures of partial legislation, bearing on Southern industry; the low price of cotton, and the consequent depression in the value of slave labor, and reduction of their price, with other causes, alarmed the fears of the border States for the safety of the institution, and inclined them to sell, at tempting rates, to our people, who, by the extraordinary fertility of our soil, still found them profitable in producing cotton. Hence the constitutional provision of 1832.

It was, however, strongly opposed in convention, and passed only after a long struggle, on the very eve almost of adjournment, by a majority of nine votes.

At the very next session of the legislature, an act was passed to abrogate this clause of the revised Constitution, but no action seems to have taken place under it. Nor was any law passed to carry into effect this provision until 1837 ; *then*, for the first time, when speculation in land and negroes had covered the State with debt and embarrassment, and when the credit and banking system had been, almost in an instant, converted into the opposite, by the "specie circular," and other measures following it, the legislature, to put a stop to wild and reckless speculation, in addition to the reasons existing at the time of the adoption of the new Constitution, passed the act referred to in *Ross* v. *Vertner*, and there relied on, as well as since, as evidence that it is not the policy of Mississippi to prevent emancipation.

Without this explanation, however, as justly remarked by Judge Sharkey, in his opinion in the case of *Mahorner* v. *Hooe*, "It might have been good policy to exclude the further introduction of slaves into this State, and it may have been also good policy to re-

tain those we had." So that no inference, *in favor of emancipation*, could be drawn with any propriety or consistency, from these measures, taken in any view.

Thus stood our policy and laws, when, in 1840, at the December term of the High Court of Errors and Appeals, it was, for the first time, suggested, that our policy only looked to the prevention of the increase of free negroes in our State, and was not opposed to emancipation generally; and further, that " it is not the policy of Mississippi to augment her slave population."

At the earliest period, after the announcement of this opinion, in February, 1842, and in express reference to the decision in *Ross* v. *Vertner*, the legislature declared *anew* the public policy, by the Act of 26th February, 1842, already quoted.

It is said, however, that this act only prohibited emancipation by will, and that the *letter of the law* does not embrace deeds, or other acts, by citizens of this State looking to emancipation.

In looking to the public acts of a State, to ascertain her policy, we are not to resort to a technical construction of laws, or even to the laws themselves, as the sole and exact measure and boundary of that policy; but we are to regard her laws *as evidence*, in connection with other facts, acts, or circumstances of a public nature, indicating what that policy is, as hereinbefore stated. The same technical rules, by which we measure the sufficiency of an indictment, are never applied to great questions of public policy, involving the rights, interests, and destiny of a State and her people.

In 1844, the legislature again proposed to abrogate the clause inserted in the revised Constitution of 1832, prohibiting the introduction of slaves. The Act of 1844 was submitted to the people, at the November election in 1845, and passed, by their direct vote, and was subsequently inserted.

The Act of 1846 repealed the Act of 1837, and *since then*, by resolutions and by public acts, this policy of the State has been repeatedly recognized and affirmed.

But to leave no misconception or room for technical construction, as late as February, 1857, the legislature of this State declared that " It shall not be lawful for any person, either by deed, will, or other conveyance, directly or in trust, either express or secret, or otherwise, to make any disposition of any slave or slaves, for

the purpose or with the intent to emancipate such slave or slaves in this State, or to provide that such slaves be removed to be emancipated elsewhere; or by any evasion or indirection so to provide that the Colonization Society, or any donee or grantee, can accomplish the act, intent, or purpose designed to be prohibited by this article. Nor shall it be lawful for any executor, trustee, donee, legatee, or other person, under any pretence whatever, to remove any slave or slaves from this State, with the intent to emancipate such slave or slaves. But all such wills, deeds, conveyances, dispositions, trusts, or other arrangements, made, had, or intended to accomplish the emancipation of any slave or slaves, after the death of the owner, no matter when made, shall be deemed and held entirely null and void; and the said slave or slaves thereby attempted or intended *to* be emancipated, shall descend to, and be distributed among, the heirs at law of the testator, grantor, or owner, or otherwise disposed of, as though such testator, grantor, or owner had died intestate." Art. 9, p. 236, Code.

In the State of Georgia, where no such prohibition exists, it was said by Chief Justice Lumpkin, in *Cleland* v. *Walters*, 19 Georgia R. 43, that "slavery is a cherished institution in Georgia; founded in the Constitution and laws of the United States, in her own Constitution and laws, and guarded, protected, and defended by the whole spirit of her legislation; approved by her people; intimately interwoven with her present and permanent prosperity. Her interests, her feelings, her judgment, and her conscience, not to say her very existence, *alike* conspire to sustain and perpetuate it. *We may* not be able to prevent *expatriation of the living*, to restrain the master in his lifetime, from removing whithersoever he pleases, with his property; but when the owner has kept them as long as *he* can enjoy them, shall he, from an ignorance of the scriptural basis, upon which the institution of slavery rests, or from a total disregard of the peace and harmony of the community, which survive him, invoke the aid of the courts of this State to carry into execution his false and fatal views of humanity? Is not every agitation of these cases, in our courts, attended with mischief? Is not every exode of slaves, from the interior to the seaboard, thence to be transported to '*a land of freedom*,' productive of evil? Can any

Mitchell *v.* Wells.

doubt its tendency?   Are there not now, in our midst, large gangs of slaves who expected emancipation by the will of their owners, and who believe they have been unjustly deprived of the boon? Are such likely to be good servants?   On the contrary, are they not likely to sow the seeds of insubordination, perhaps revolt, among the slaves in their neighborhood."

And again: "We are told, and truly, that slaves constitute a portion of the vested wealth, and taxable property of the State; that, without them, a large portion of our most productive lands would be worthless; that it would be contrary to her policy, therefore, to part with this vested wealth, this prolific source of revenue; with that which, alone, renders her cotton and rice lands valuable.; that it is spreading a dangerous influence among the negroes of the country, for slaves of whole plantations to acquire their freedom, take leave of the country, and make their departure with great pomp and parade, proclaiming liberty for themselves and their posterity; that it renders those who are left behind, dissatisfied, refractory, and rebellious; and that it may, probably will, if not checked in time, lead to insubordination and insurrection."

He admits the force of these arguments, but laments that the legislature of Georgia does not indicate a policy against such emancipation.

These suggestions apply with great force to the State of Mississippi.   They are, *in themselves, without reference to legislation, specially declaring policy,* strongly indicative of what the policy of the State is.   The rule laid down by the Georgia court is too narrow and limited where it is said, "The policy of a State is to be gathered from her constitution and laws."   It is true these afford the highest, most usual, direct, and positive *evidence* of that policy, but not the *only* sources of evidence from which to ascertain it. Her whole condition, circumstances, and history, may, in connection with her constitution, laws, resolutions, and public acts, be adduced and relied on as evidence of her public policy.

The fact that, by the common consent of all the States, at the adoption of our Constitution, the negro race was excluded from association and political equality with the whites, as an inferior class, affords, *in itself,* strong evidence of the policy of those States at that early period.   That some of them have changed their

policy, and adopted the policy of emancipation, does not affect the policy, rights, or duties of those who still adhere to their ancient views.

I cannot therefore doubt, in view of the whole subject, that it *now is* and *ever has been*, the policy of Mississippi to protect, preserve, and perpetuate the institution of slavery as it exists amongst us, and to prevent emancipation generally of Mississippi slaves.

I might *even admit*, that until the last act of our legislature quoted above (1857), there was no declaration of our policy against the whole doctrine of emancipation ; and yet in the *case before me, now to be decided*, this right of suit, or to take property by devise, bequest, or otherwise, *in this State*, cannot be maintained.

A slave once domiciliated here, *during the continuance of that domicile* has no such rights. If the appellee possess them at all, then she must have derived them from the law of her new domicile. That law, *proprio vigore*, has no extra-territorial operation, and could *vest no right* in the appellee *here*, except by the comity or consent of the State of Mississippi. She stands before the authorities of this State with no vested right, but as a suppliant for such comity and courtesy as states, *in the most intimate relation*, usually ought to extend to each other, or to their citizens. She is entitled, therefore, to such *rights only*, as are not inconsistent with our laws or policy *at the time* such law is administered. The Act of 1857, in this view, would operate as a repeal of the remedy or law of comity, authorizing suit by such liberated slave, pending the action. By our law she had neither capacity to sue, nor take, nor hold property, originally, before she left this State. The law of her new domicile confirming such rights in Ohio, are limited to that domicile, and cannot be made to extend over us without our consent, as she can have no *vested right* to claim or demand a mere favor, *a gratuity dependent at all times on the will of the donor ;* when that favor or courtesy is withheld by the State, her *right* must cease with it, in obedience to the *will of the sovereign*, which in such cases is the law of the court, irrespective of rights acquired in another State. Mr. Cobb, in his work on the history and law of slavery (a work distinguished alike for ability, research, and a clear and lucid perception and arrangement of the subjects of which he treats), after showing that slavery in this country is derived from the pure

and absolute slavery existing among the tribes of Africa, and that it is in no wise opposed to the law of nature as it exists here, says, "It follows, that no actual enactment of the legislative power is necessary for its introduction into any country where no municipal law is thereby infringed. The condition of these slaves in their native country, having been one of absolute slavery, including the power over life, such would be their condition in the country to which they are removed, except so far as the same may be modified by the existing laws of their new domicile, and subsequent legislative enactments made for their benefit. The law of nature, denying the power over life and limb, being a part of the law of every civilized state ; such power never existed in any of the United States, although it required municipal law to prescribe the punishment for such offences. Many subsequent enactments have been passed, regulating the power of the master, and protecting and giving rights to the slave. *Having none prior to these enactments, to the municipal law we must* look for all his rights." Cobb on the Law of Slavery, 83, sect. 83, 84 ; citing 2 Dev. L. R. 268 ; *The State* v. *Mann*.

Chief Justice Taney, in *Scott* v. *Sandford*, 19 How. S. C. R. 404, says, that negroes whose ancestors were imported into the United States and sold as slaves, " *are not included, and were not intended to be included*, under the word ' citizens' in the Constitution of the United States, and can therefore claim none of the rights and privileges which that instrument provides for and secures to citizens of the United States. On the contrary, they were, at that time, considered a subordinate and inferior class of beings, who had been subjugated by the dominant race, and whether emancipated or not, yet remained subject to their authority, and had no rights or privileges but such as those who held the power and the Government might choose to grant them."

" A State may confer citizenship within its own limits, but not the *rights of citizenship as a member of the Union*." " A negro may have all the rights and privileges of a citizen of the State, and yet not be entitled to the rights and privileges of a citizen *in any* other State."

" He would *then* have no rights or privileges beyond those secured to him by the laws of nature or the comity of states."

The same doctrine is stated by Mr. Cobb: he says, " The law, by recognizing the existence of the slave as a person, thereby confers on him no rights or privileges except such as are necessary to protect that existence. *All other rights must be granted specially.*" Cobb on Slavery, sect. 89.

He distinctly asserts that a slave cannot be a suitor in court. Ibid. 247, sect. 278. " This disability accompanies the slave to every jurisdiction, so long as his *status* is unchanged." Ib. sect. 278.

" Of the other great absolute right of a freeman, viz. : the right of private property," he says, " the slave is entirely deprived. His person and his time being the property of his master, whatever he may accumulate by his own labor, or is otherwise acquired by him, becomes immediately the property of his master." Ibid. 235, sect. 258, citing many authorities. Nor is it in the power of a slave to change his domicile. " The domicile of the slave, as a general rule, is that of the master ; and this not being of choice of the slave, but by operation of law, by no act of his can it be changed." Ibid. 117, sect. 129, and authorities cited.

" Much less is it in the power of a slave to change his condition from that of slavery to freedom by a removal to a free State : the *status* of his domicile attends him everywhere." Ibid. 123.

" It is the privilege of every government to confer citizenship, and none have it except those upon whom it has been conferred." Ibid. 315, sect. 389.

" To withdraw his dominion over the slave is the privilege of the master. To incorporate a new citizen into the body politic is only within the power of the State." Ibid. 312, sect. 384.

The freed negro does not become a citizen by virtue of his manumission. It requires the act of the State to clothe him with civil and political rights. *Crandall* v. *The State*, 10 Connecticut R. 340 ; *Bryan* v. *Walton*, 14 Georgia R. 185 ; 1 Meigs R. 331 ; Justice Daniel in *Scott* v. *Sandford*, 19 How. U. S. R. 477.

" The incapacity to contract, to hold or own property, or to sue in courts of justice, being a part and consequence of his personal *status*, extends to every place he may go, so long as he remains a slave." Cobb, 246, sect. 277.

Hence, a fugitive slave, though he may be in a State where slavery does not exist, is incapable of contracting, his *status* remain-

ing unchanged. Cobb, sect. 277; *Giles* v. *Hodges,* 9 John. 67; *Trougott* v. *Byers,* 5 Cowen, 480; *Williams* v. *Brown,* 3 Bos. & Pull. 71; *Free Lucy & Frank* v. *Durham's Admr.* 4 Monroe, 169.

And the same result must follow in *this State,* so far as concerns all these incapacities, notwithstanding manumission in another State, so long as *emancipation* is contrary to the laws and policy of Mississippi. The denial of the right and policy of emancipation here, is a denial *here* of every right or incident which is attached to it elsewhere. The laws of other States cannot confer *rights* in this State in opposition to our policy.

" The laws and usages of one State cannot be permitted to furnish qualifications for citizens, to be claimed and exercised in other States, in contravention of their local policy." 2 Kent Com. 36, (9th edit.)

But again : I wholly dissent from the application of the doctrine of "comity" to cases like this. " Comity" forbids that a sister State of this confederacy should seek to introduce into the family of States, as equals or associates, a caste of different color, and of acknowledged inferiority, who, though existing among us at the time of our compact of Union, were excluded from the sisterhood by common consent.

What is this doctrine of comity, as understood among jurists? Judge Story, in his Conflict of Laws, cites, with approbation, the remarks of Mr. J. Porter in *Saul* v. *His Creditors,* 17 Martin's Lou. R. 569, where, speaking of the views of foreign jurists on this subject, he says: " They have attempted to go too far, to define and fix that which cannot, in the nature of things, be defined and fixed: they seem to have forgotten that they wrote on a question which touched the comity of nations, and that that comity is, and ever must be, uncertain." . . . " That no nation will suffer the laws of another to interfere with her own, to the injury of her citizens ; that whether they do or not, must depend on the condition of the country in which the foreign law is sought to be enforced; the particular nature of her legislation, her policy, and the character of her institutions." Story on the Conflict of Laws, 39, § 28.

It is the voluntary act of the nation by which it is offered, and is inadmissible when contrary to its policy and prejudicial to its

interests.    Story on Conflict of Laws, 47, § 38, and Ch. J. Taney, in *Bank of Augusta* v. *Earle*, 13 Peters, 519.

"And of this every independent community will judge for itself, how far the *comitas inter communitates* is to be permitted to interfere with its domestic interests and policy." 2 Kent Com. 601, (9th edit.)

No people are bound, or ought to enforce or hold valid, *in their courts of justice*, any contract which is injurious to their public rights, or offends their morals, or contravenes their policy, or violates a public law.    2 Kent, 602.

Mr. Cobb says: "The very name, *comitas inter communitates*, exhibits the foundation of these principles.    It is comity, courtesy, founded upon mutual respect, and promotive of mutual interest, the offspring of commerce and enlightenment, the handmaid of justice and of peace."    Page 183, sect. 200.

Mr. Kent says: "It is a part of that law of nations, which is founded on the principle, that nations ought to do each other all the good they can, without injury to their own true interests." 1 Kent, 2.    Or, as Mr. Blackstone, borrowing from the civil law, expresses it, "*Quod naturalis ratio inter omnis hominis constituit vocatur jus gentium.*"

After all that learned writers have announced on this subject, it may be truly said, that by "comity," among states or nations, is only meant what is understood by courtesy, politeness, good-breeding, among families and neighbors.    Its principles equally have their origin and illustration in those simple maxims of ethical philosophy which are the result of civilization and enlightenment, as well among nations as individuals.

What is meant, therefore, when we speak of this law of comity, is simply the obligation which the rules of sound morality, enlightened justice, and natural reason suggest to every nation as promotive of mutual happiness and good-will, in their intercourse with their neighbors.    *Quod naturalis ratio constituit se vocatur comitas.*

Tested by these principles, on what foundation does this claim to the obligations of comity, in the case before us, rest?

The State of Ohio, forgetful of her constitutional obligations·to the whole race, and afflicted with a *negro-mania*, which inclines her

to *descend*, rather than elevate herself in the scale of humanity, chooses to take to her embrace, as citizens, the neglected race, who by common consent of the States united, were regarded, at the formation of our government, as an inferior caste, incapable of the blessings of free government, and occupying, in the order of nature, an intermediate state between the irrational animal and the white man.

In violation of good faith, as well as of the guarantees of the Constitution, efforts are made to destroy the rights of property in this race, which, at the time of the adoption of that instrument, was in servitude, in all or nearly all the States originally parties to the compact of Union. Mississippi and other States, under the firm conviction, that the relation of master and slave, which has existed within her limits, from the organization of the State government to this day, is mutually productive of the happiness and best interests of both, continues the institution, and desires to perpetuate it. She is unwilling to extend to the slave race freedom and equality of rights, or to elevate them into political association with the family of States.

Ohio persists; and not only so introduces slaves into her own political organization, but her citizens extend encouragement and inducement to the removal of slaves from Mississippi into the limits of Ohio; and then, in violation of the laws and policy of Mississippi, and in violation of the laws of the United States in relation to the rendition of fugitive slaves, introduces them into her limits as citizens.

Looking at the transaction in the light of comity, courtesy, founded on mutual respect and mutual good-will, regarding it as a question of neighborly politeness and good breeding, or in the more intimate relation of constitutional brotherhood, in which the advocates of this doctrine of comity choose to place it, and it seems to me that comity is terminated by Ohio, in the very act of degrading herself and her sister States, by the offensive association, and that the rights of Mississippi are outraged, when Ohio ministers to emancipation and the abolition of our institution of slavery, by such unkind, disrespectful, lawless interference with our local rights.

But when I am told that Ohio has not only the right thus to degrade and disgrace herself, and wrong us, but also, that she has the

right to force her new associates into the Mississippi branch of the American family, to claim and exercise rights *here*, which our laws have always denied to this inferior race, and that Mississippi is bound to yield obedience to such demand, I am at a loss to understand upon what *principle* of law or reason, of courtesy or justice, such a claim can be founded.

Suppose that Ohio, still further afflicted with her peculiar philanthropy, should determine to descend another grade in the scale of *her peculiar* humanity, and claim to confer citizenship on the chimpanzee or the ourang-outang (the most respectable of the monkey tribe), are we to be told that "comity" will require of the States not thus demented, to forget their own policy and self-respect, and lower their own citizens and institutions in the scale of being, to meet the necessities of the mongrel race thus attempted to be introduced into the family of sisters in this confederacy?

The doctrine of comity is not thus unreasonable. Like the benign principles of moral duty, which regulate the miniature government of family in social life, it commands no duty, the observance of which will tend to degrade a sister in the family of nations.

If the sister, in violation of morality, and respect for herself, as well as her associates of the old household, will insist on the meretricious embrace, we are neither bound to sanction nor respect it, much less to receive her new associate into our immediate circle.

The duty to respect the rights of its constituent members, is no less obligatory upon states than families. The same immutable laws of natural reason and justice, which regulate the one, should govern and control the other. They are what the law denominates, imperfect obligations as sanctioned by reason and the common good, but, from their very nature, incapable of strict enforcement by penal sanctions. The obligations of comity being mutual and reciprocal, as well as voluntary, no State in this confederacy may violate that comity towards others, and thereby impose obligations on such others not previously existing.

Ohio, by allowing the manumission of defendant in error in her jurisdiction, and conferring rights of citizenship *there*, contrary to the known policy of Mississippi, can neither confer freedom on a Mississippi slave, nor the right to acquire, hold, sue for, nor enjoy property in Mississippi.

Let the decree be reversed and bill dismissed, at the cost of defendant in error.

HANDY, J., delivered the following dissenting opinion.

I cannot concur in the views of this case taken by the majority of the court. Many of the views taken in the opinion of the court have, in my judgment, no application to the questions we are called upon to decide in the case before us. The abstract policy of slavery, or of the manumission or freedom of slaves, is a question not belonging to this forum, nor proper to be determined by it. We are sitting *as a court to adjudicate* whether an emancipated slave has certain legal rights claimed by her. We have no right to establish or enlarge the policy of the State as to freedom or slavery, as defined by the legislature; our power is confined to *deciding* what the *legal rights* of parties are, under the policy as declared by the law-making power; and whether that policy is right or wrong, too short or too extended to answer the purposes intended, we have no power to change, modify, or extend it beyond its plain scope. That power pertains to the legislature. In briefly giving my views of the case, I shall, therefore, confine myself to the question: what is the law in relation to the rights of the appellee, as it is found in the statutes of this State, touching the subject, and in the expositions of this court of the private rights and public policy declared and established by those statutes. In coming to a correct conclusion upon this point, I do not think it necessary or proper to go beyond our own statutes and decisions, believing that they furnish the proper and most ample solution of the subject of inquiry.

The question is, whether "a person of color," once domiciled and a slave in this State, but afterwards legally removed to another State of this confederacy, and there manumitted according to the laws of that State, and residing there, can acquire or exercise any civil right whatever in this State, the enjoyment of which does not require the residence or individual presence of such person in this State? In the opinion of the majority of the court, this question is answered in the negative; and such a person is held to be incapable of suing in our courts, and of asserting any right whatever which such person might have, either of person or of property, according to the law of the State of his residence. Believing, as

I do, that the law of this State, upon the question, is firmly settled to the contrary of this view, I will proceed, in a very brief manner, to state the grounds of this opinion.

It is stated in the opinion of the court, as the predicate of its main conclusions, that the emancipation of slaves in other States where it is lawful, is not recognized by our laws, as expounded by certain decisions of this court; and that it is contrary to the policy as established by our own statutes and declared by this court, to allow them any rights in this State.

We will be able to determine the correctness of these positions by an examination of the provisions of our Constitution and statutes upon the subject, and the decisions of this court upon those statutes.

And first in the order of time is the Statute of 1822, Hutch. Code, 523, § 75, which authorizes the owner of slaves to emancipate them in this State, by last will and testament, or deed, upon proof to the legislature of some meritorious act done by the slave to the master, or some distinguished service done to the State, subject to the sanction of the legislature. This act plainly had reference alone to manumissions to be made in this State, and was a restriction upon such acts to operate upon slaves here. By the first section of the article of the revised Constitution, in relation to slaves, the legislature is authorized to pass laws permitting the owners of slaves to emancipate them, saving the rights of creditors, and preventing them from becoming a public charge. This provision also manifestly had reference to emancipation to be made, and to take effect, in this State, and recognized the principle that the *status* of freedom, in the person of color, might exist here without a violation of our domestic policy.

In this condition of our Constitution and statute law, upon the subject, the first case involving the question which came before this court was *Hinds* v. *Brazealle*, 2 How. 837. It appears, in that case, that Brazealle, a resident of this State, took his slave to Ohio for the purpose of emancipation there, and with the intention of bringing him back here, and that he accordingly executed a deed of emancipation in Ohio, and immediately brought the slave back to this State, and treated him as free, and bequeathed him his property. The validity of the emancipation was the question presented to this court, upon this state of case. The court first lays down

the rule, " that no State will enforce a contract made by its citizens elsewhere, in violation and in fraud of its laws;" and proceeds to show that the alleged emancipation was made for the purpose of taking effect here, and was " *in violation of the declared policy* and *contrary to the positive law* of this State;" which policy is stated to be, that free negroes are not permitted to immigrate to, or remain in, this State; were allowed few privileges, and subject to heavy penalties for offences, and were required to leave the State within thirty days after notice. And this policy was violated by the return of the person in question to this State from Ohio. The positive law was held to be violated because the alleged emancipation was an evasion of the Statute of 1822, above referred to, placing restrictions upon the right of emancipation; and the conclusion of the court, referring to the principle first laid down as above stated, is, that the emancipation " seems to have been planned and executed with the fixed design to evade the rigor of the laws of this State. The act of the party in going to Ohio with the slaves, and there executing the deed, and his immediate return with them to this State, point with unerring certainty to his purpose and object. The laws of this State cannot be thus defrauded of their operation by one of our own citizens," and as the validity of the deed depended, for these reasons, upon the laws of this State, it is held to be in fraud of them, and void.

The whole scope of this decision plainly is, that the emancipation was made in Ohio to take effect and be enjoyed here, in fraud of our laws, which was shown by the speedy return of the slave here, in contravention of our laws prohibiting free negroes from immigrating to this State; and that nothing is said by the court which can be properly understood to indicate that the *bona fide* emancipation of slaves in other States according to their laws, and with the intention of remaining there, is contrary to any law or declared policy of this State. If any such doctrine had been asserted, it would clearly have been foreign to the case, and a mere *obiter dictum*. It is, however, plain that it was not asserted in fact, nor intended to be; and if there could have been doubt on this point, it would be removed by the explicit declaration of this court in *Ross* v. *Vertner*, 5 How. 305–360. In that case, it is said by the court, referring to the case of *Hinds* v. *Brazealle*,—Judge Sharkey, who

delivered the opinion of the court in that case, concurring,—" The deed of emancipation was held void, *because, as a contract for freedom, it was to be executed in Mississippi,* whose laws and policy forbid it in the mode there attempted, and because the farcical excursion into Ohio by the testator, his. immediate return into this State with his slaves to his former residence, and continuing there as a citizen up to the period of his death, with other circumstances, *demonstrated his intention to evade the laws of this State,* and commit a fraud upon their provisions." And again, " That case went on *the ground expressed by the court,* that the deed of emancipation having been made in Ohio, in pursuance of a scheme planned and executed to evade the rigor of the laws of this State, *was to be treated as a deed made in this State, and to be executed here,* and *therefore* clearly void." Ib.

The case of *Ross* v. *Vertner,* which was decided in the year 1840, holds that it is not against the laws or policy of this State for a testator to direct his slaves held in this State to be removed to another State where they may be legally freed, and to set them free; and states that this is in accordance with the principle recognized in the case of *Hinds* v. *Brazealle,* which condemned only emancipation made elsewhere, and to take effect here in fraud of our laws.

The case of *Vick* v. *McDaniel,* 3 How. 337, appears to have been an emancipation by will in this State, and the slaves afterwards to be removed beyond this State; and the bequest was held void because the emancipation was to take effect here, and was prohibited by our laws. The same rule is held in *Luckey* v. *Dykes,* 2 S. & M., upon a similar will; but the rule in *Ross* v. *Vertner,* in relation to the validity of an emancipation by will to take effect in another State, is affirmed.

The next case was *Leach* v. *Cooley,* 6 S. & M., decided in 1846, and after the passage of the Act of 1842, but upon a will probated in 1836, manumitting slaves, to take effect in another State. The bequest was held to be valid, and the rule in *Ross* v. *Vertner* again affirmed; and the court say, that "*the policy of this State, as evinced by its legislation, is to prevent the increase of free persons of color in this State.*"

The same rule is held in *Wade* v. *American Colonization So-*

*ciety*, 7 S. & M., in relation to a bequest for emancipation, to take effect out of this State. The rule in *Ross* v. *Vertner*, and in the other cases above cited, is again affirmed; and such bequests of emancipation out of this State are held not to be in violation of the laws or policy of this State. This case, like that of *Leach* v. *Cooley*, though decided after the passage of the Act of 1842, which will be presently noticed, was made upon a will which took effect before the passage of that act, and is treated by the court as not affected by that act.

Thus it appears that the rule, up to this time, has been declared and constantly reiterated and acted upon, that " the policy of this State, as evinced by its legislation, is *to prevent the increase of free persons of color in this State*," and that manumissions by deed made in other States, *bona fide*, conferring freedom to be exercised there and not here, in evasion of our laws and policy, or by will to take effect in other States, are not in contravention of our laws and policy.

And this being the settled law at the date of the Act of 1842, we are brought to consider that act, and how far it altered the law as then settled, and what are the character and effect of the decisions subsequently made, both in relation to that statute, and the general subject of the rights of free persons of color.

Many of the provisions of the act are unnecessary to be noticed, for the purposes of this case, and only such will be referred to as have a bearing upon the questions here involved.

The first section requires free negroes and mulattoes, unlawfully in this State, to give security for their good behavior, or, in default, to be sold.

The second section provides, in substance, that *all slaves which shall be taken or sent out of this State and emancipated*, and shall afterwards be found within the State, shall be proceeded against as free negroes unlawfully in this State.

The eleventh section makes it unlawful thereafter, for any person, " *by last will and testament*," to make any bequest of a slave, for the purpose of emancipation, or to direct that any slave shall be removed from this State for the purpose of emancipation elsewhere; and in all wills made for that purpose, before the passage of the act, it should be unlawful for the executor to remove the slaves from this

State, unless the removal should be made within one year from the passage of the act.

It is obvious, from this statute, that the legislature had in view two objects, 1st, to prohibit free negroes from remaining in this State unlawfully, and to prevent such as might be emancipated out of the State, by owners residing here, from coming into the State; and, 2d, to prohibit emancipation *by last will and testament*, of slaves held in this State, to take effect in other States. It is abundantly manifest that the statute prohibits emancipation only when attempted to be effected *by wills*, either made here or affecting slaves being here; for that is the plain and positive extent of the prohibition, and of the change of policy previously established, as recognized by the decisions of this court above cited, in relation to emancipation made by will in this State, to take effect out of the State. That it was not intended further to interfere with the right of the owner to dispose of his slave as he thought fit, in another State, after removal there, or to manumit him there, by deed or lawful act, and to reside there, is most palpable, not only from the entire *absence* of anything in the statute indicating such an intention, but from the *positive recognition* of the right of the owner to take his slave to another State and manumit him there, contained in the second section. That section *prohibits persons so manumitted* from coming into this State, and plainly recognizes them as validly manumitted.

After the passage of this act came the case of *Mahorner* v. *Hooe*, 9 S. & M., which involved a will made by a testator domiciled in Virginia, and who died there in the year 1844, directing his slaves in this State to be emancipated, and sent to Africa. The will took effect after the passage of the Act of 1842; and as it operated on slaves in this State, it was contended to be invalid by virtue of that act. On the contrary, it was insisted that the testator, being domiciled in Virginia, by whose laws the will was valid,—its disposition of movable property was governed by the laws of that State, on the general principle that the law of the domicile was the rule of succession and testaments. But the court held that this was a rule of comity, which could not be permitted to prevail *against our positive law*,—that it was a will emancipating slaves *being in this State*, whose freedom was to take place out of the State, in contravention of the policy positively declared

by the Act of 1842, that slaves in this State should not, *by last will and testament*, be set free, to take effect in another State; that the case came within the principle of that act, and that the rule of comity " cannot be allowed to defeat the general policy of a State, declared by the legislative authority;" thus placing the decision directly upon the prohibitory policy, as it was positively declared by the Act of 1842.

The policy which was considered to be contravened by this will, was *that declared by the Act of* 1842. The mischief plainly contemplated by the section of that act upon which the decision is based, was the manumission of slaves held in this State, by will, to take effect out of the State. That was the extent of the policy of prohibiting emancipation, declared by the act, as appears by its terms, and as is expressly stated in the subsequent case of *Read* v. *Manning*, 30 Miss. 308; and to that extent alone does the court, in *Mahorner* v. *Hooe*, refer to the policy of the act, and attempt to apply that policy to the case before it. The case appears to be considered by the court as not within the strict letter of the act, because the testator resided in another State; and hence the remark as to it being *within the policy declared by the act*, as it was the case of a will and an emancipation of slaves here, attempted to be made in the mode prohibited by the act.

That the court did not intend to hold that the Act of 1842 declared any policy prohibitory of emancipations made otherwise than by last will and testament contemplating freedom to take effect in other States or countries, is too clear for controversy. For the decision is placed expressly upon the prohibitory policy *declared by that act*, and the will is held to be in contravention of that policy. This is not a matter of doubt or inference, but is clear from the entire opinion; for the court is careful to exclude the conclusion that the decision proceeds upon anything but the policy positively declared by the act. After stating that the rule of comity relied on could not be allowed to defeat the policy declared by the statute, the court says: " We have nothing to do with the good or bad policy of the law of 1842; it is sufficient for us to know that the legislature thought it wise and proper. Courts in this country have not the power to declare policy, except as it may be indicated by the legislature, or result from the spirit and object of statutes."

And the following is stated as the conclusion of the matter : " We accordingly think *the Act of* 1842 *is a valid prohibition,* paramount to the rule of comity, which, *in the absence of such prohibition,* might sustain the bequest on the ground of the testator's domicile." And upon this ground alone is the decision placed. The decision, therefore, holds that the *rule of comity is abrogated no further than that act does it,* and that is as to manumission *by will* to take effect out of this State, which was the case before the court.

It will appear beyond controversy, from a careful examination of that case, that there is nothing in it which gives the least countenance to the idea, that the manumission of a slave, made *bona fide* by deed or other legal act, in another State, where the slave has been taken for the purpose by his owner, a resident of this State, is contrary to our laws and policy; or that a person of color, legally free and entitled to rights in another State of this confederacy, can claim no right or remedy in this State under any circumstances. In point of fact, no such doctrine is held or intimated in the case ; .and if it had been, it would have been plainly *obiter dictum,* and not authoritative. It would, moreover, have been contrary to all previous decisions of the court, and directly in opposition to the recognition of the validity of such emancipations contained in the second section of the act which formed the basis of the rule held in the case.

It appears to me clear, therefore, that the case of *Mahorner* v. *Hooe,* leaves the questions involved in this case untouched, and furnishes no support to the argument of the majority of the court attempted to be justified by it; and thus far, that no decision of this court gives any sanction to the idea that our laws and policy prohibit emancipations of slaves removed by their owners for the purpose to other States, if made according to the laws there, and not in fraud of our laws.

Much stress is placed by the majority of the court upon the assumption that the case of *Hinds* v. *Brazealle* holds the doctrine that " the policy of this State is to prevent emancipation," and that the same doctrine is held in the subsequent cases above noticed. It is clear that no such doctrine is declared in that case ; and in the subsequent cases cited, so far as any expression of opinion has been

made by the court, it is, that *the policy of this State, as evinced by its legislation, is to prevent the increase of persons of color in this State.* *Leach* v. *Cooley ; Ross* v. *Vertner ; Wade* v. *American Colonization Society.*

Let us, then, see what is the rule in relation to the *status* and rights of free persons of color legally emancipated in other States, as held by the decisions subsequent to *Mahorner* v. *Hooe.*

The first was *Leiper* v. *Hoffman,* 26 Miss., which was a suit by a free person of color, who had removed from this State to Ohio, where she became free by the consent of her owner, and became a resident, to recover real estate in the city of Natchez ; and it was held that she was to be considered a free person according to the laws of Ohio, and as such was entitled to sue in the courts of this State, and that our laws do not prohibit the removal of slaves by their owners from this State to another State to become free there, provided it is not done with the intention of their returning here to act as free persons. In that case, also, it is stated—as it had also been previously stated in *Ross* v. *Vertner*—that the principle decided in the case of *Hinds* v. *Brazealle* was that the deed in that case was void, because made in fraud of our laws ; and the decision was against the doctrine that our laws and policy prohibited emancipations by legal act and *bona fide* made in other States.

*Read* v. *Manning,* 30 Miss., already noticed, was a *bequest* of slaves to be free, and it was held to be void in virtue of the Act of 1842, and the policy of that act is considered to be limited to emancipations by will.

The next case is *Lusk* v. *Lewis,* 32 Miss. 297, which was a will bequeathing slaves to the American Colonization Society ; and it was held to be in effect a bequest for the purpose of emancipation out of this State, and void under the Act of 1842.

The last case is *Shaw* v. *Brown,* at April term, 1858, 35 Miss. 246, which was an emancipation by deed in Ohio and also in Indiana, of certain slaves previously held by their owner in this State, made *bona fide,* and not with the intention of evading our laws. That case was elaborately discussed by counsel at the bar, and in arguments in writing submitted to the court, and was carefully examined and considered ; and in view of all the previous decisions and of the policy of the State as declared by statute, it was held

that the owner of slaves, in this State, has the right to remove them to another State where the emancipation is allowed, and set them free there ; that that right is not restrained by our laws and policy, but is distinctly recognized by the second section of the Act of 1842, and that it resulted from his absolute right of disposition of them as his property, which our laws do not restrain when so exercised ; that the extent of the policy of our laws prohibitory of emancipation is, first, against freeing slaves *in this State* to become free either here or in another State, and, secondly, against emancipating them in another State to become residents of this State as free persons ; that slaves removed from this State and legally set free in other States, though not "citizens" within the meaning of the term in the Constitution of the United States, are *inhabitants* or *subjects* of those States in which they are domiciled, and as such acquire certain rights there, which should be enforced in the courts of this State, upon principles of international comity, arising from the nature and character of our Federal Union, unless repugnant to our laws and policy, or prejudicial to the public interest ; that they might acquire and enforce legal rights here, which did not require their coming into this State ; and that "they are only debarred by our laws of the rights secured to them by the laws of other States where they are domiciled, so far as the exercise of these rights may be positively prohibited, or may be directly dangerous to the condition of our slaves, by exposing them to improper interference, or to the mischievous example arising from the presence or influence of the free negro ; and that, beyond this, he may enjoy the rights secured to him by the laws of his place of domicile."

This brings us down to the recent Statute of 1857, Rev. Code, 236, art. 9, which provides, that "it shall *not be lawful for any person, either by will, deed, or other conveyance,* directly, or in trust, either express or secret, or otherwise, to make any disposition of any slave or slaves for the purpose, or with the intent, *to emancipate such slave or slaves in this State ;* or to *provide that such slaves be removed to be emancipated elsewhere ;* or by any evasion or indirection, so to provide that the Colonization Society, or any donee or grantee, can accomplish the act, intent, or purpose designed to be prohibited by this article,"—prohibiting executors from removing any slave from this State for emancipation,—and "all

such wills, deeds, &c., . . . *intended to accomplish the emancipation of any slave after the death of the owner, no matter where made, are declared void.*"

It is perfectly manifest that this act extends only to emancipations made *to take effect in this State,* and to provisions by deed, will, &c., whether made in or out of this State, for the removal of slaves from this State to be emancipated elsewhere. It merely condenses the provisions of the Acts of 1822 and 1842, with the addition of incorporating the rule in the case of *Mahorner* v. *Hooe,* extending the prohibition to wills made out of the State. This is plainly the whole scope of the act.. It has not the least reference to the removal of slaves by the owner to another State, and his emancipation of them there, for the plain reason that the legislature had no power to make such an act void; and the folly of making such an effort should not be imputed to them. But if the act extended, in its terms, to such cases, it could not be construed to have a retrospective effect to destroy rights existing before its passage, as in this case. *Murray* v. *Gibson,* 15 How. (U. S.) 421; *Garret* v. *Beaumont,* 24 Miss. 377.

Thus we have before us the policy of this State upon the subject of emancipations of slaves in other States, as it has been declared and defined by our statutes, and expounded by this court. We see that the whole scope of these statutes is to prohibit emancipations of slaves in this State, by deed or will, to take effect here or in other States, and emancipations made in other States to be exercised here; and prohibitions against free negroes of other States coming into this State; and that, so far as the legislature has touched the subject of emancipation of slaves made in other States, and according to their laws, by owners who have removed them from this State *bona fide* for that purpose, such emancipations are recognized as valid. It is needless to inquire into the reasons for this policy. It is sufficient that the legislature has established it, and defined its extent. True, the State will not allow within its limits the exercise of rights contrary to their laws and policy, but we must look to her laws and public declarations of policy as they are *judicially known* to us, to see what that policy is. The legislature has not thought fit to interdict the enjoyment of any civil right of a free person of color residing in another State, and manu-

mitted according to the law of that State, except to prohibit such persons from coming to, and remaining in, this State. And when we look at the extent of this policy, as expounded and settled by the decisions of this court, we see that, *in every case in which the question has been presented to this court, emancipations by deed, or other legal act, made in other States, bona fide, and not for the purpose of evading our laws, by the return of the slave here, have been held to be valid, and not in contravention of our laws and policy;* and, accordingly, it has been invariably held, that free persons of color, so manumitted in other States, might sue and maintain their legal rights in our courts.

Such being the policy of the State upon the subject, as defined by legislative acts, and settled by judicial construction of those acts, it appears to me that the decision of the majority of the court is productive of two very dangerous consequences: 1st. *To overturn the rule of law* as settled and recognized in every case in which it has come under the consideration of this court, upon a question at least doubtful apart from the decisions; and, 2d. *To declare a policy* for the State which the legislature, in acting upon the subject, has not established, and which is firmly settled,—if anything can be by this court,—not to be within the policy established by the legislature; thus unsettling the law of this court upon the subject, and arrogating to the court the powers of the legislature, to establish and declare a public policy upon a most important subject—setting a precedent which, if followed, must prostrate the character and usefulness of this court, by rendering the rules held by it fluctuating and uncertain, and invading the legitimate province of the legislature, to institute or extend a matter of public policy.

I have always considered that, except perhaps in questions involving a construction of the Constitution, we were bound to adhere to rules firmly settled and repeatedly sanctioned and reaffirmed by this court, especially those affecting private rights. But if we can unsettle a rule of property and private right declared, reiterated, and established, as the rights here involved have been, no question may be considered as settled, and no one can feel secure in the rights which he has acquired, acting upon rules settled by this court. All security for private right is destroyed where it depends upon questions which have once been the subject of dispute, but

have been settled by this court. The *individual opinions of the judges*, for the time being, and not *the law as settled*, become the rule of action. No man in this State, or out of it, and having transactions with our citizens, or rights in it, will feel certain that he holds his property or his right upon a firm and settled rule of law. We are reduced to that "miserable servitude where the law is vague and uncertain." The conservative character of the court is broken down, and all confidence in the stability of its rules is destroyed in the minds of good citizens. Such a result is, in my judgment, scarcely less deplorable than abolitionism.

Not less dangerous is the doctrine that we have the power to enlarge a policy, by construction, beyond what the legislature has plainly extended it. The safe and wise rule is, that we must conclude that the legislature, to whom the power is committed by our system of government, has extended the policy as far as they thought it proper and expedient. *Our office is to sustain and enforce that policy so far as the legislature has declared it, and no further;* and, in the case of *Mahorner* v. *Hooe*, considered by the majority of the court so important to their view, the court says: "Courts in this country have not the power to declare policy, except as it may be indicated by direct legislation, or result from the spirit and objects of statutes." The same rule has been constantly and firmly declared in the construction of our Statutes of Frauds and of Limitations, and other general statutes. And I can see nothing in the subject of slavery and negro emancipation, which makes it an exception to this salutary rule, or enlarges the powers of this court.

If this rule be correct, and it has the universal sanction of the wisest sages of the law, how can we derive from our statutes the policy of denying to free persons of color, legally free in other States, all civil rights whatever, and say that such a policy is comprehended in them? If we look to their terms, we find that no such prohibitory policy is included in their provisions. We find that the subject of the rights of such persons, who have been removed to, and legally manumitted in other States, and do not come into this State, is absolutely untouched by legislative interdict. Every enactment of our statutes, in relation to the emancipation of slaves in other States, and prohibiting their coming to or re-

siding in this State, may be carried out, and yet the free negro in another State may sue for his right of person or of property here. By what implication, or by what reason indicated by these statutes, is this right to be prohibited ? and how is it possible that such right can come within the mischief provided against by these statutes ? If it was the great mischief supposed, it cannot have escaped the attention of the legislature, while they were so frequently legislating upon the general subject of emancipated slaves, and the evils to be apprehended from their condition; and as they have laid no interdict upon such rights, it is to be presumed that they were not intended to be embraced in the legislation, and were not intended to be prohibited.

What power, then, has this court to take the step of saying, as the legislature has failed to provide for such an evil, yet, that it is an evil to our domestic institutions, whose genius is averse to the emancipation of slaves ; and, therefore, we will extend *the princi-ple* of our institutions and our policy, beyond what the Constitution and laws have interdicted, and debar the free negro of another State of all rights of person and of property in this State ?  What is this but judicial legislation of the most decided character ?  True, the legislature has not thought fit to exercise its power, which properly pertained to it, upon the doubtful and delicate subject of debarring the inhabitants of the co-States of this confederacy, obnoxious as they are to us as a class of population, of the remedies for the enforcement of their legal rights here, which they may enjoy without coming to, or residing in, this State.   But this court will consider such a right inconsistent with correct opinions as to the policy of negro emancipation ; hold that *negro emancipation elsewhere is contrary to the principle of our domestic policy ;* and *supply the defect in legislation,* by declaring such rights illegal and contrary to our policy and institutions !   Upon the same principle, in the case of a subject of Great Britain in Canada,—free negro though he might be,—whose property was unlawfully taken and brought into this State by one of our citizens, this court might proceed to declare, that no remedy was to be allowed to such British subject by the laws of the land, because he was the subject of a monarchical government, and the policy of our institutions is against monarchy.

If we have the right to declare and establish a policy for the State upon this subject, and under the circumstances of this case, then it appears to me, that the power of this court over matters of public policy is limited only by its discretion. It becomes the province of this court *to make laws*, and not merely *to declare what the law is ;* and there is very little need for the legislature of the State to pass any further general laws, or to establish any further public policy. The legislature has already passed enactments to a limited extent, and so far as they thought the public interest required, upon most of the subjects of public concern ; and these will furnish the germs of judicial legislation which this court can enlarge and expand, according to its ideas of public policy, and the character of our institutions, and as, in view of the advancement of science and of the light of new theories, the public welfare may, in their judgment, require.

It appears to me, that the doctrine which lies at the foundation of the opinion of the majority of the court, is wrong in principle and dangerous in practice, as a matter of judicial action.

Our policy upon the subject of slavery and slave emancipation is, in principle and in action, *a domestic policy.* The legislature makes laws for the protection of slavery, and of property in slaves, *in this State*, and to prevent acts being done or carried out *in this State*, dangerous to its existence, and to the welfare of that class of population here. All our legislation has reference to the institution within our limits; not because negro emancipation in other States has not been considered by us as an evil, for undoubtedly that is the private opinion of the most enlightened, if not of all, amongst us, and it has the full concurrence of my individual judgment ; but because we had no power to interfere with the *status* of the free negro residing in another State, and legally emancipated, according to the laws of that State, and not in fraud of our laws. Our opinion in relation to the impolicy of tolerating such a class of population in another State, is a mere abstract opinion, which we do not attempt to enforce in any manner upon other States, any more than such State would have the right to complain that we allowed such rights to resident Indians, or for any other matter of our domestic policy. We have no control over, or right to complain of, the internal policy of a sovereign State of the confederacy, in allowing rights of person

and of property to a free person of color, though we may and do think that that policy is wrong in principle and dangerous in practice. It is a rare thing for governments to attempt to interfere with the rights of the resident subjects of another government; and certainly they are not to be taken and considered as the objects of a hostile policy, unless they are clearly embraced in a public declaration of it. When two governments are under treaty of peace and friendship, the subjects of each would be entitled to all the rights in the jurisdiction of the other, to which they were entitled at home, unless expressly forbidden by the terms of the treaty, or unless plainly prejudicial to the rights or powers of the foreign government, or in contravention of its positive law or public policy. Story's Confl. Laws, § 38. In governments of written laws, this policy and law are declared and enacted by the lawmaking power. It is matter of positive law: Vattel's Law of Nations, book 2, § 94; and when that power has not declared a matter to be against the policy of the State, it must be taken not to be prohibited by law, or only so far prohibited as it is clearly declared to be. And especially is this the case, when the government has placed restrictions upon the enjoyment of the rights within its limits, *to a certain extent.* The exercise of the right, in all other respects, must, in such case, be considered as not interdicted; for the inclusion of the one is the exclusion of the other.

Let us apply these plain principles to our policy in relation to a free person of color of another State.

The whole extent of our declared policy against him is, that he shall not come into this State to reside. We cannot change his condition there, and have not attempted to deny him any such right here as he may enjoy without a violation of the declared policy of this State with regard to him. He is a subject and inhabitant of a co-State of this national confederacy, between which and this State the relation of, at least, a treaty of peace and friendship subsists; and he is entitled to rights of person and of property there, under her laws, and to the protection of that State in the enjoyment of them. He is entitled to the benefit of the rule of comity between States to its fullest extent, except so far as it is denied by our declared policy. "The intimate union of these States," says the Supreme Court of the United States, "as members of the same

great political family; the deep and vital interests which bind them so closely together, should lead us, in the absence of proof to the contrary, to presume a greater degree of comity, and friendship, and kindness towards one another, than we should be authorized to presume between foreign nations. And when (as without doubt must occasionally happen) the interest or policy of any State requires it to restrict the rule, it has but to declare its will, and the legal presumption is at once at an end. *But, until this is done, upon what grounds could this court refuse to administer the law of international comity between these States?* They are sovereign States; and the history of the past, and the events which are daily occurring, furnish the strongest evidence that they have adopted towards each other the laws of comity in their fullest extent." *Bank of Augusta* v. *Earle*, 13 Peters, 519, 590.

Suppose a free negro of another State is abducted and brought into this State, and held in slavery, or his property is taken and brought into this State, or a right belonging to him in this State is withheld, has he no remedy for such a wrong? He has violated no declared policy of this State; and, as to his personal liberty, he claims the benefit of our law, which provides, "that *any person in this State*, who shall conceive himself or herself illegally detained as a slave, in the possession of another, and claiming his or her freedom, shall proceed by petition in the Circuit Court," &c. Hutch. Code, 523, § 76. Yet he is told that he has been emancipated contrary to our policy, and is entitled to no rights here, and must, therefore, continue a slave. He seeks a remedy by law for his property, which has been unlawfully taken from him and brought into this State, or is unjustly withheld from him here; claiming the benefit of the provision of our Constitution, which gives "*every person*" a remedy, by due course of law, for any injury done to him in his person or his property. Article 1, sect. 14. He is told that he is *an outlaw*, and not a "*person*" entitled to sue here, although the statute just referred to designates him as "a person," capable of suing to obtain his freedom in our courts. He is said to be an *alien enemy* to our State. If so, there is no restraint in our law against taking his life. He is entitled to no protection under our laws; and, under the opinion of the majority of the court, as he occupies the position of an alien enemy, and is entitled to no rights or pro-

tection here except such as are positively conferred by our laws, and none such are conferred, he must be regarded as an alien enemy was by the barbarian rules which prevailed in the dark ages, and which the majority of the court appear to sanction as still in force; and, by virtue of these rules, any man here has the right to kill him as a public enemy.

It seems to me that the doctrine which debars such a person of a remedy in our courts for such rights as are not in contravention of our declared policy, cannot be justified upon principles of justice, humanity, or sound law. The right which he seeks to enforce is not forbidden by any law or declared policy of this State. If this State and that of which he is a subject, were foreign nations under treaty of peace and friendship, the denial of such right here would, upon principles of public law, be just cause of war. Vattel, book 2, §§ 71, 350. But the States are bound together by much stronger ties than those created by treaty. They are component parts of a national confederacy; and though each is sovereign in itself, yet each is under the most sacred obligations, arising from the nature of the compact, to protect the rights of the inhabitants of another State secured by the laws of that State, when it may be necessary, within her limits, to the extent that it is not forbidden by her constitution or laws, or plainly prejudicial to the public interest.

"Of all compacts," says Mr. Calhoun, speaking of the nature of the relations between the States, arising from the Constitution of the United States, "that can exist between independent and sovereign communities, it is the most intimate, solemn, and sacred, whether regarded with reference to the closeness of the connection, the importance of the objects to be effected, or to the obligations imposed." Discourse on the Constitution of the United States, 1 Calhoun's Works, 276.

It is a capital error to suppose that the rule of international comity has any reference to, or is at all affected by, the particular domestic condition *of the individual* citizen or subject of the foreign State. It proceeds entirely from respect *to the nation* of which the person, whose individual right is involved, is a member; and as that State owes its citizen or subject protection in his legal rights at home, arising under her laws, the foreign State, within whose limits those rights may be involved, is bound in comity *to that State*

to extend to him the same protection which the State of his allegiance owes him, unless inconsistent with her declared policy. Vattel, book 2, §§ 71, 81. Nor has the State in which such right may be . sought to be enforced, any right, in such case, to inquire into the question whether the *status* allowed to the individual by his own State be right and proper according to the views of the State where the right may be claimed; for it is manifest that this would be such an interference with the peculiar privilege of the State, as would inevitably destroy all peaceful intercourse. To the nation alone belongs the settlement of that question, for herself and her citizens or subjects; and as it is settled by her, so is it treated, and the rights flowing therefrom respected, by all friendly nations or States. Vattel, book 2, §§ 54, 55; Wheat. International Law, 132.

These considerations are applicable, with peculiar force, to the relations subsisting between the States of this confederacy. Each State is bound to respect and protect, within her limits, the rights to which any person residing in another State of the confederacy may be entitled by the laws of that State, unless clearly interdicted by the laws and policy of the State where they may be sought to be enfcrced. This results necessarily from the nature of the union, from the remaining sovereignty of the States, and from the high duty of each State to protect the rights of her people against the violence of the other States; and if this principle is denied, this Union is the frailest and most imperfect of human fabrics.

If the right of an inhabitant of one of the States of the confederacy, such as the appellee in this case, is to be taken, as it appears it must be, not to lie within the *express* guarantees of the Constitution of the United States; yet such a person, being a " subject" or an " inhabitant" of the State of his residence, owing obedience to that State and entitled to her protection, has the privilege, in virtue of the right of his State, founded on principles of international comity, to assert the right to which he was entitled by the laws of his own State, and which is not interdicted by the laws and policy of the State where the right may be asserted. The 9th and 10th amendments to the Constitution of the United States reserve to the people of the several States the rights and powers not enumerated in that instrument, and delegated to the confederacy, nor prohibited to the States; and the right of an inhabitant or

subject of any State, not enumerated, remains as a sovereign power reserved to the State, and to be exercised by those entitled to her protection according to the principles applicable to the relations of independent nations. It is a *casus non fœderis,* and is to be governed by the principles of public law.

Then what is the nature of the right under consideration? It stands as though a subject of a foreign sovereign State was deprived of his legal right here by a citizen of this State; and according to the rule of international comity existing between sovereign States, between which friendly relations subsist, he would be entitled to assert his right here ; and in case of a denial of justice, his sovereign would be justified in taking coercive measures, either belligerent or otherwise, to protect his right.

But by the 10th section of Article 1 of the Constitution of the United States, the States are prohibited from engaging in war, or from issuing letters of marque and reprisal; and it would be repugnant to the very genius of the Union established by the Constitution, that one State should engage in war against another State of the confederacy for the protection of her rights or those of her people. Such a state of things could not consist with the Union, and would plainly be a subversion of it. What, then, is the remedy or means of redress of a person resident in one State, and having property or rights by the laws of that State, of which he is deprived by a citizen of another State, such person not being a "citizen" of the State of his residence, within the meaning of that term in the Constitution of the United States, but being an inhabitant of that State and under the protection of her laws? To deprive him of his property or right which he might hold or enjoy by the law of the State of his residence, would be clearly wrong. He is recognized by the State of his residence as a person entitled to protection in his property and rights; and if, as an inhabitant of such State, he is not entitled to redress in the courts of the State in which the wrong may be done him, there is then no remedy to a certain class of the people of a State for injuries done to their persons, property, or rights by a citizen of another State. They are debarred of all remedy in the courts of such State; and the State of their residence, which owes them protection, is deprived, by the Constitution of the United States, of that power which independent nations have, by coercive measures, to redress the wrongs

of their citizens or subjects committed by those of another State. Consequently, according to the doctrine here asserted by the majority of the court, a portion of the people of one of the States of this confederacy are without remedy as individuals to redress a wrong, or to enforce a legal right in a co-State of the Union; and the States of their residence are, by the very terms and spirit of the Constitution, deprived of the power to redress their wrongs, and extend to them the protection which they owe them; and it follows, that the inhabitant of one of the States of this Union has less protection in his right, and less means of redress of a wrong against a citizen of another of the States, than the subject of Great Britain, France, or Russia would have, either directly or through the instrumentality of his sovereign, against a citizen of one of these States.

A *doctrine leading to such a result cannot be maintained*; yet such is the consequence, if the views of the majority of the court, as to the *status* and legal rights of free persons of color of the co-States of this confederacy, be correct.

It appears to me that such a theory is alike subversive of the sound doctrine of the reserved rights of the States, and of the reciprocal duties and obligations which subsist between the States from the very nature of the compact. It renders the Union arising from the compact less than the mere obligation of a treaty of peace and friendship between foreign nations, and deprives a portion of the people of one State of rights as against the citizens of another State, which subjects of foreign States may enjoy and enforce against the same State. It renders that which was designed " to form a more perfect union, establish justice, and insure domestic tranquillity" between the States, the instrument of strife, injustice, and dissension. It proves the union formed by the Constitution to be a short-sighted and miserable failure.

It is said that the violation by the non-slaveholding States, of the constitutional rights of the Southern States, in harboring our fugitive slaves and in furnishing them protection against the claims of their owners, deprives them of all claim to international comity in reference to the rights of their free negroes who may seek to assert rights in our courts.

But this sacred duty,—to respect and enforce the rights of residents of other States, secured to them by the laws of those States,—

can never be destroyed, whilst the confederacy continues, by the fact that the State under which the right is ˌclaimed, has been recreant to her obligations to the compact which binds the States together.  If their courts of justice have been prostituted to the purposes of fanaticism and lawlessness, that is no reason why we should descend from our elevated position, which should be superior to such influences, follow their unworthy example, and make this court the medium of propagating our political theories upon the same subject.  Whilst the confederacy continues, we cannot justify ourselves as a State in violating its spirit and principles, because other States have, in some respects, been false to their duties and obligations.  It may justify us in dissolving the compact, but not in violating our obligations under it whilst it continues.

Under the decisions of this court, free persons of color of other States are entitled to sue in our courts, not as " *citizens*," in the sense of the term in the Constitution of the United States; but as " *subjects*" or " *inhabitants*" of the State in which they reside, except so far as such right comes within the prohibition of our positive law or declared policy; and this under the rule of comity above stated.  *Shaw* v. *Brown,* and *Leiper* v. *Hoffman.*

But this court has gone further, and recognized the right of suit in our courts in *a free negro of this State,*—a class of persons coming fully within the alleged policy denying all rights to the free negro here, except such as are expressly granted.

In *Benoit* v. *Brill,* 7 S. & M. 32, Benoit, a free man of color,— to whom the legislature had relinquished the claim of the State, by escheat, to the property of his natural father, Barnard Benoit, deceased,—filed his petition for distribution of his father's estate. The administrator answered, denying that he was a free man of color, and alleging that he was a slave, and the property of the estate.  The court held that he was a free person of color, and his petition was sustained. . It must be taken that he was legally in this State, yet no power is conferred upon him to sue, and according to the doctrine of the majority of the court, a free negro, either here or elsewhere, is entitled to no such right, unless positively granted.

The rule to be deduced from the case is, that free negroes must be embraced within the general provisions of our Constitution and statutes, *recognizing rights in persons,* unless excepted, or excluded

Mitchell *v.* Wells.

by clear implication; and that free negroes who are permitted to reside here have such rights and protection under our laws. Otherwise the strange spectacle would be presented of a class of persons permitted by law to reside in this State, but incapable of carrying on any business requiring dealings with our citizens, in order to their support, or of acquiring any property, but subject to be robbed at the pleasure of any plunderer, without remedy for its recovery; thus authorizing their residence here, but virtually depriving them of the means of support, and forcing them to subsist by plunder and crime. A doctrine leading to such results cannot be sound; and it appears to me contrary to the plain scope of our policy in permitting them to become free here and to remain here, and to the spirit of our statutes and constitutional provisions. For the statute above cited plainly gives them the right to sue for their freedom under the designation of "*persons*," and the Constitution extends to *all* " *persons*" the right of suit and of protection, in their persons and property, by due course of law.

The fundamental and controlling idea upon which property in slaves rests is, the *right of absolute disposition;* and this is paramount to any question as to how, or in whose behalf, the right shall be exercised. That right, so far as it refers to the disposition of the person of the slave, is unlimited, except as it is restricted by regulations of positive law. The restrictive policy, as declared by this State, is limited to emancipation of slaves in this State, to take effect here or elsewhere. But it does not extend to removal out of this State and emancipation there, and could not, for want of power to carry out any such policy. It would be contrary to all reason and principle for us to attempt to establish any law or policy prohibiting the owner in this State from removing his slave to England or India, and manumitting him there to reside there; and for the same reason, we have none interdicting the removal to Ohio for manumission and residence there. Our abstract opinions are, that such a course is impolitic; but such opinions have not been established *as a policy*. Our policy, *as a State,* has no reference whatever to free negroes out of the State, except to prevent them from coming to this State and residing here. It is based upon the same principle as all our domestic policy; having reference to our own internal welfare and protection, and to the promotion of the mo-

rality and happiness of society. The same policy prohibits the importation of pauper infants, lunatics, vagrants, or aliens, into this State, and also subjects some of those persons to penalties; yet it would scarcely be said that, if persons of that character were residents of other States, they would not be entitled to sue in our courts for legal rights here. So our domestic policy has been strongly against banking in this State; yet no one would contend that a foreign bank might not sue in this State upon any legal right acquired in another State. These things, though contrary to a policy of a domestic character, contemplated by our laws, are not within their prohibition, because our laws have reference solely to the prevention of the mischiefs within this State.

Thus we perceive the error and the danger of taking *a reason* upon which a policy, as declared by statute, is *supposed* to be founded; which supposition is necessarily uncertain and problematical, and establishing it by judicial sanction, as the policy of the State,—a principle which would give to the judiciary unlimited legislative power.

Considering, as I do, the right of the appellee claimed in the bill as a firmly settled question in this court, and dissenting widely from the opinion of the majority of the court, in announcing views as rules of law which I do not consider to fall within the province of this court, I have felt it my duty thus to state the reasons for my dissent.

A reargument was asked for, but refused.